[Cite as *State v. Smith*, 2016-Ohio-8420.]

**IN THE COURT OF APPEALS**

**ELEVENTH APPELLATE DISTRICT**

**ASHTABULA COUNTY, OHIO**

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2015-A-0027** |
| EDWARD A. SMITH, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Ashtabula County Court of Common Pleas, Case No. 2014 CR 030.

Judgment: Modified and Affirmed as Modified.

*Nicholas A. Iarocci,* Ashtabula County Prosecutor, and *Shelley M. Pratt,* Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047-1092. (For Plaintiff-Appellee).

*Gregory A. Price,* 159 South Main Street, Suite 910, Akron, OH 44308 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, P.J.

{¶1} Appellant, Edward Smith, appeals his conviction, following a jury trial, in the Ashtabula County Court of Common Pleas of two counts of murder. The principal issue is whether the trial court abused its discretion in not instructing the jury on involuntary manslaughter. For the reasons that follow, we modify appellant's sentence and affirm as modified.

{¶2} Appellant was charged in an amended indictment with two counts of murder, each being an unclassified felony and each carrying a firearm specification, and having weapons while under disability, a felony of the third degree. Appellant pled not guilty.

{¶3} Subsequently, appellant waived his right to a jury trial on the weapons-disability charge and, following a bench trial, the court found him guilty of that offense. The case proceeded to jury trial on the murder charges.

{¶4} Reginald Tolbert testified that on November 25, 2013, he spent the day in the Cleveland area with his cousin Elliot Dowdell visiting friends and relatives. Elliot needed to go to Ashtabula and asked Reginald for a ride. Reginald agreed. He called his then-girlfriend (now wife) Lavetta Williams, asking her if she would like to go with them for the ride and she agreed.

{¶5} Reginald and Elliot arrived at Lavetta's house at about 8:30 p.m. After visiting awhile, they started the trip to Ashtabula. Lavetta was driving Reginald's car. During most of the trip, Elliot was on the phone talking to someone who was giving him directions to a residence in Ashtabula. As he was getting the directions, Elliot gave them to Lavetta. Reginald and Lavetta both said that during the trip, Elliott was very nervous, chain smoking the entire trip.

{¶6} Lavetta testified that once they arrived in the Ashtabula area, she noticed they were being followed by a black car. Elliot told her to slow down and when she did, the car passed them. Elliot then told her to follow that car. As she did, the car took off, going through red lights until it lost them.

{¶7} After driving for about one hour, they arrived at their destination, which was a single-family residence on Hiawatha Ave. The house was the residence of an acquaintance of Elliot and Reginald named Rhamaud Hull, a.k.a. "Maudi," who Lavetta did not know. When they arrived there, Elliot got off the phone. He told Reginald and Lavetta to stay in the car and he went in the house.

{¶8} Within a few minutes, a car pulled up that was driven by a black male. Reginald called Elliot on his cell phone and asked Elliot to check on the male in that car. Reginald heard Elliot tell Maudi to let the male in.

{¶9} A few minutes later, a second car pulled up to the house, which was being driven by another black male. Reginald called Elliot again and he let the male in.

{¶10} Shortly thereafter, a female pulled her black car into Maudi's driveway. At the same time, a thin black male, later identified as LeDondre Raimey, pulled up behind her. Lavetta and Reginald testified that the female who pulled into Maudi's driveway was driving the same car that had been following them earlier. Reginald called Elliot and said the car that had been following them just pulled into the driveway. Reginald heard Maudi say the woman was his girlfriend, Shaqualla Montgomery, and she and LeDondre entered the house.

{¶11} Soon thereafter, Elliot called Reginald and told him to bring Lavetta and come in the house. Lavetta testified she was reluctant to go in because she thought the foot traffic they were watching outside the house was suspicious. However, they both went in. Upon entering, Shaqualla told Lavetta she had to take her shoes off before coming into the house. This annoyed Lavetta because everyone else in the house had their shoes on, but she complied and left her shoes in the hallway near the front door.

Reginald and Lavetta went in the living room and joined Shaqualla and three males who were watching television. One of those males was LeDondre, the thin male who entered the house with Shaqualla. Reginald and Lavetta did not know any of the men in that room.

{¶12} One of the three males in the living room walked into the kitchen. A sheet had been set up at the doorway between the kitchen and the living room blocking everyone's view into the kitchen. A few minutes later, that male came out of the kitchen and left the house. Then, LeDondre left the living room and walked into the kitchen.

{¶13} Lavetta said she then heard a noise in the hallway, and noticed a big white male standing in the hallway by the front door. He apparently entered the house on his own; Shaqualla did not get up or open the door for him.

{¶14} At that time, Maudi, Elliot, and LeDondre were in the kitchen. At one point Maudi came out from behind the sheet, showed everyone in the living room a bag of pills he said were drugs, and then returned to the kitchen.

{¶15} Later, Elliot came out of the kitchen and asked Reginald for a cigarette. He did not have any so he went outside to get one from his car. The big white male standing in front of the door moved to allow Reginald to pass. Reginald got a cigarette, then returned to the house and gave it to Elliot. He then went back into the kitchen.

{¶16} Meanwhile, Reginald, Lavetta, Shaqualla, and the sole remaining black male were still in the living room watching television. Sometime later, appellant entered the house and walked into the living room. Reginald recognized appellant, whose nickname is "Booman," and said, "what's up, Booman?" Appellant, who was wearing a

4

hoodie and had his right hand in his pocket, acknowledged Reginald and shook his hand. Appellant then went in the kitchen.

{¶17} About one minute later, at about 11:10 p.m., Lavetta said she heard one gunshot and then three others. Reginald said, "come on," and he and Lavetta ran to the front door, but were stopped by the big white male. Reginald pushed him aside and broke the locked screen door and ran out of the house, followed by Lavetta. She testified that as she was running, she stopped, turned around, and went back in the house to get her shoes, which she left in the hallway. As she was picking up her shoes, she saw appellant running down the hall toward the front door carrying a black gun. Appellant ran past Lavetta and went outside.

{¶18} Reginald testified that appellant ran to a truck that was being driven by a female. Appellant told her to open the door of the truck and he jumped in. He got in the passenger seat and the female drove off.

{¶19} Lavetta ran to Reginald's car, which was parked in the street in front of Maudi's house. The third male that was in the living room ran out of the house, jumped in a pick-up truck, and left. The big white male ran away from the house and across a nearby field.

{¶20} Reginald and Lavetta then went back in the house to see if Elliot was all right. When they walked into the living room, the sheet covering the entrance into the kitchen was down. At that time, Maudi and Shaqualla were in the kitchen with two males, Elliot and LeDondre, who were lying on the floor. Reginald's and Lavetta's phones were not working so Reginald told Maudi to call 911, but he refused. Lavetta said that Maudi was leaning over Elliot going through his pockets. Maudi then went in

5

LeDondre's pockets and took money out. Maudi cleared the kitchen table of drugs. He and Shaqualla then put the drugs in Shaqualla's car, which was still in the driveway.

{¶21} After Maudi and Shaqualla cleared out the house, at about 11:20 p.m., Maudi told her to call 911. Maudi left the scene and Shaqualla stayed outside the residence. Within a few minutes, the police arrived. Reginald led them into the kitchen.

{¶22} Lieutenant Jason Erwin and Officer Christopher Defina of the Ashtabula Police Department testified that at 11:30 p.m., they responded to a call via dispatch at 3418 Hiawatha Ave. regarding multiple shots fired with two victims shot. Lt. Erwin said that as he approached the house, Shaqualla and Reginald, in a highly excited state, said the two people inside had been shot. They said the shooting suspect had fled the scene and they identified him as "Booman."

{¶23} Lt. Erwin and Off. Defina entered the house and found two gunshot victims, both lying face-down on the kitchen floor. Off. Defina said that Elliot, the larger of the two males, was lying near the rear exit door. He was not breathing and appeared to be dead. He had a bullet hole in the front of his left shoulder. LeDondre, who was closest to the door leading from the kitchen to the living room, had a bullet hole in his back by his rib cage and had labored breathing. The officers did not find anyone else in the house.

{¶24} Lt. Erwin noticed two spent shell casings on the kitchen floor. These casings were later found by BCI to have been fired from the gun in appellant's possession when he was arrested in a motel that morning. Off. Defina said there were fresh bullet holes in a kitchen cabinet and a fresh bullet hole by the door where Elliot was lying. Within a few minutes, EMS arrived and transported LeDondre to the hospital

6

where he later expired. Elliot was transported to the coroner's office. Lt. Erwin transported Maudi's girlfriend Shaqualla and Reginald to the police department to be interviewed; however, Shaqualla was not cooperative.

{¶25} Detective William Felt of the Ashtabula Police Department testified that the department had information that appellant was staying at the Economy Inn motel in Ashtabula. That morning, on November 26, 2013, at about 7:00 a.m., Detective Felt and several other officers went to the motel to attempt to locate him. Detective Felt learned from the desk clerk that appellant was staying with Jasmine Ruth in Room 115. Detective Felt and the other officers knocked at the door. Ruth answered the door. When she opened it, appellant was lying on the floor in a prone position with his arms extended, and Det. Felt handcuffed him.

{¶26} Det. Felt found a large amount of money in appellant's pants pocket. He also saw suspected illegal drugs in plain view on the floor near the bathroom door. The substances were later tested by BCI and found to be cocaine and heroin. Appellant and Ruth were arrested. Det. Felt then found a chunk of suspected crack cocaine on a night stand and appellant's cell phone.

{¶27} Det. Felt said they found on a chair a dark-colored hooded sweatshirt and a bullet proof vest. BCI later determined that appellant's DNA was on both items.

{¶28} Det. Felt found a Springfield XD .45 caliber black pistol with a magazine inserted in it. The clip contained an unfired bullet. The gun was found between the mattress and box spring of the bed. BCI later determined that DNA samples taken from the trigger and handle of the gun matched appellant's DNA.

{¶29} Det. Felt testified that Elliot's cell phone records reflected text messages sent and received by Elliot's phone on November 25, 2013. The phone records showed that at 8:30 p.m., Maudi and Elliot were arranging for the sale of two ounces of cocaine and haggling over the price. Elliot agreed to sell Maudi two ounces for $2,350.

{¶30} At 10:00 p.m., Elliot sent a text to Maudi saying he was on his way to Maudi's house. At 10:50 p.m., which was about 20 minutes before the shootings, Elliot texted appellant, saying he was leaving (apparently referring to Maudi's house). This was Elliot's last text message to appellant.

{¶31} Det. Felt said that appellant's cell phone records showed several phone calls between appellant and Elliot shortly before the murders. Significantly, appellant called Elliot at 10:54, about 15 minutes before the shootings, and Elliot called appellant at 11:11 p.m., just before he was killed. Appellant's phone records also showed that he had three phone conversations with Maudi within 20 minutes after the shootings.

{¶32} Antonio Carlton testified that in August 2013, appellant, who he has known since childhood, called him and told him he needed to talk to him. Carlton lives in Ashtabula, but works in the Cleveland area. When Carlton came home from work that day, appellant showed up at his house in Ashtabula. Appellant told him that Elliot, who was a close friend of Carlton, had sold him, i.e., appellant, some "bad drugs." "Bad drugs" refers to drugs that have been cut or diluted with another substance. Appellant said, "I can't allow that to happen * * * something going to have to give."

{¶33} After appellant left Carlton's house, Carlton called Elliott and told him not to come to his house in Ashtabula anymore. After this incident, Carlton and Elliott continued to see each other on a regular basis between August and November 2013,

8

but only in Cleveland. Carlton said he warned Elliot to stop selling cut drugs because Maudi and appellant were getting upset about it.

{¶34} Further, Trayvon Jackson testified that he and appellant grew up together and stayed in contact over the years. Trayvon said that he saw appellant occasionally at Trayvon's girlfriend's house in October and November 2013, because appellant was seeing Trayvon's girlfriend's roommate at the time.

{¶35} Trayvon said that when appellant was at the house, he told Trayvon that a person named Elliot, who Trayvon did not know, had sold him some bad drugs and that Elliott was supposed to make it up to him. Trayvon said that appellant was upset by what Elliot had done.

{¶36} Trayvon said he saw appellant at the house earlier on the day Elliot was killed and at that time appellant had a gun. The night Elliot was killed, appellant called Trayvon and said, "I got a bitch," which, according to Trayvon, meant that appellant had killed or beat up whoever he was looking for. Appellant's cell phone records confirm that appellant called Trayvon one-half hour after the shootings.

{¶37} Donna Schwesinger, forensic scientist at BCI, testified that gunshot residue was found in samples taken from both of appellant's hands. She also said that gunshot residue was detected in a sample taken from Maudi's left hand, although, according to Detective Joseph Cellitti, Maudi is right-handed. She said that firing a weapon is not the only way gunshot residue can get on a person's hands. She said that can also happen by being near a weapon when it is discharged or by handling an item that has gunshot residue on it. She said that gunshot residue was also found on the

9

hands of both victims.  She said it is not unusual to find gunshot residue on a victim's hands if they were close enough to the gun used.

{¶38} Dr. Erica Armstrong, forensic pathologist and deputy medical examiner with the Cuyahoga County Medical Examiner's Office, testified that she performed an autopsy on Elliot Dowdell.  She said there was a penetrating gunshot wound of his left shoulder.  She said the bullet then went through the left side of his chest, ribs, left lung, heart, right lung, and into his right armpit where the bullet was recovered.  The bullet was later determined by BCI to have been fired from the gun found in appellant's possession when he was arrested.  She said Elliot's cause of death was a gunshot wound of the left upper extremity with visceral, vascular, and soft tissue injuries.

{¶39} Dr. Armstrong said that LeDondre Raimey sustained a penetrating gunshot wound of his right chest from a bullet that entered his back.  The bullet fractured the back of the right rib beneath where it entered.  The bullet injured his diaphragm and caused his right lung to collapse.  The bullet also injured his liver, kidney, small intestine, and pancreas, and was recovered from the intestine on the left side in the pelvic area.  This bullet was also determined by BCI to have been fired from the gun in appellant's possession when he was arrested.  Dr. Armstrong said LeDondre's cause of death was a gunshot wound of the trunk with visceral, skeletal, vascular, and soft tissue injuries.

{¶40} Appellant did not testify or present any witnesses.  Thus, the state's evidence was undisputed.

{¶41} Following the trial, the jury found appellant guilty of both counts of murder and both firearm specifications.  At sentencing, the court noted that appellant was

10

convicted in 2005 of conveying a deadly weapon in a school safety zone. In 2006, he was convicted of felonious assault with a firearm specification and having weapons while under disability. In 2012, he was convicted of failing to comply with an order of a police officer. Later in 2012, he was convicted of felony drug possession. As to his conviction of count one, the murder of Elliot Dowdell, the court sentenced appellant to 15 years to life. As to his conviction of the firearm specification of that count, the court sentenced him to a mandatory term of three years. As to his conviction of count two, the murder of LeDondre Raimey, the court sentenced appellant to 15 years to life. As to his conviction of the firearm specification of that count, the court found that the firearm specification in both counts merged for sentencing purposes. The court also found that appellant's conviction of having weapons while under disability merged with the two murder counts. Further, the court ordered that the sentences for the two counts of murder be served consecutively to each other.

{¶42} Appellant appeals his conviction, asserting three assignments of error. For his first assignment of error, he alleges:

{¶43} "The trial court committed reversible error when it refused to instruct the jury on the lesser-included offense of involuntary manslaughter."

{¶44} The Supreme Court of Ohio has held that involuntary manslaughter is a lesser included offense of murder. *State v. Thomas*, 40 Ohio St.3d 213, 215-216 (1988).[1] A person is guilty of murder when he *purposely* causes the death of another. R.C. 2901.02(A). In contrast, a person is guilty of involuntary manslaughter when he

---

1. We acknowledge that, in *State v. Brown*, 11th Dist. Lake No. 2014-L-037, 2016-Ohio-1358, this court observed that involuntary manslaughter is not a lesser included offense of purposeful murder. That was an inaccurate statement of law and should be disregarded. It is worth pointing out that the statement does not affect the ultimate disposition of *Brown*.

11

causes the death of another as a proximate result of committing or attempting to commit a felony. R.C. 2903.04(A). The Supreme Court has stated that "'the common element shared by these two offenses is the causing of the death of another with the *only* distinguishing factor being the mental state involved in the act.'" (Emphasis added.) *Thomas, supra,* at 216, quoting *State v. Johnson*, 6 Ohio St.3d 420, 424 (1983).

{¶45} "Although involuntary manslaughter is a lesser included offense of murder, a court should give an instruction on the lesser included offense only where the evidence presented at trial is such that the jury could reasonably support both an acquittal on the crime charged and a conviction upon the lesser degree offense." *State v. Ziegler*, 11th Dist. Trumbull No. 2003-T-0168, 2005-Ohio-1099, ¶27, citing *Thomas, supra,* at 216. More recently, the Supreme Court of Ohio has held that an instruction on a lesser included offense is not required unless the evidence presented at trial would reasonably support both an acquittal of the crime charged and a conviction of the lesser included offense. *State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948, ¶21. Whether to give a jury instruction on a lesser included offense lies within the discretion of the trial court, and depends on whether the evidence could reasonably support a jury finding of guilty on a lesser included offense. *Id.* at ¶1.

{¶46} Recently, the Fourth District in *State v. Wilson*, 4th Dist. Scioto No. 13CA3542, 2015-Ohio-2016, ¶42-44, succinctly stated the law regarding when an instruction on a lesser included offense is warranted, as follows:

{¶47} Determining whether a lesser included offense instruction is warranted involves a two-part test. *State v. Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, ¶6. First, a trial court must determine if the requested charge is a lesser included offense of the charged crime. *Id.*; *State v. Kidder*, 32 Ohio St.3d 279, 281 (1987). Second, the court must consider the evidence:

12

{¶48} "The trial court, after reviewing the evidence, determines whether an instruction on lesser included offenses is appropriate. The trial court must give an instruction on a lesser included offense if under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense." *Wine, [supra,]* at ¶34.

{¶49} However, "[t]he mere fact that an offense can be a lesser included offense of another offense does not mean that a court must instruct on both offenses where the greater offense is charged." *Id.* at ¶22. Instead, "the quality of the evidence offered * * * determines whether a lesser-included-offense charge should be given to a jury." *Id.* at ¶26. *A lesser included offense instruction requires more than "some evidence" that a defendant may have acted in such a way as to satisfy the elements of the lesser offense. State v. Shane*, 63 Ohio St.3d 630, 633 (1992). "To require an instruction * * * every time 'some evidence,' however minute, is presented going to a lesser included (or inferior-degree) offense would mean that no trial judge could ever refuse to give an instruction on a lesser included (or inferior-degree) offense." *Id.* at 633. * * *

{¶50} When a court reviews the quality of the evidence offered, the court must consider "[t]he whole of the state's case." *State v. Bethel,* 110 Ohio St.3d 416, 2006-Ohio-4853, ¶141 (2006), citing *State v. Goodwin*, 84 Ohio St.3d 331, 345 (1999). * * *

{¶51} *The trial court has discretion to determine whether a record contains sufficient evidence to support a lesser-included-offense instruction. State v. McFadden*, 4th Dist. Washington No. 14CA5, 2014-Ohio-5294, ¶6; *see Wine* at ¶21 (explaining that "[t]he law, the evidence presented, and the discretion of the trial judge play a role in whether lesser-included-offense instructions are appropriate"). Thus, we will not reverse that determination absent an abuse of discretion. * * *

{¶52} Here, appellant argues the jury could have reasonably found that he did not purposely cause the death of the victims, but, rather, that the deaths were accidental or otherwise not purposeful. We do not agree.

{¶53} First, the state presented ample evidence that appellant purposely caused the death of the victims. "A person acts purposely when it is the person's specific

13

intention to cause a certain result * * *."  R.C. 2901.22(A).  "A jury may infer a purpose to cause death from a defendant inflicting a wound upon a person with a deadly weapon in a manner calculated to kill."  *State v. Wilson*, 10th Dist. Franklin No. 05AP-277, 2006-Ohio-643, ¶38.  "In making such an inference, the jury may consider the places where bullets entered the victim and the resulting wounds." *Id.*, citing *State v. Strodes*, 48 Ohio St.2d 113, 116 (1976).

**{¶54}**  After appellant shot Elliot with a .45 caliber handgun in the front of his left shoulder, the bullet immediately entered the left side of his chest, ribs, left lung, heart, and right lung, causing his death.  From these facts, the jury could reasonably infer that appellant intended to cause Elliot's death.  Appellant argues that because the bullet entered Elliot's left shoulder, this means he did not intend to kill him. However, the bullet entered Elliot's upper torso into his chest in close proximity to his vital organs.

**{¶55}**  In addition, appellant shot LeDondre in the back and fractured his right rib just beneath where it entered.  The bullet also injured LeDondre's rib and diaphragm and caused his right lung to collapse.  The bullet also injured his liver, kidney, small intestine, and pancreas, resulting in his death.  From these facts, the jury could likewise reasonably infer that appellant purposely caused LeDondre's death.  Appellant concedes the injury sustained by LeDondre from being shot in the back was "significant," but argues, it "paled in comparison to the damage Maudi and Shaqualla did when they refused to call an ambulance for 20 minutes.  On cross-examination, appellant tried to get Dr. Armstrong, the medical examiner, to support this theory. However, she testified she could *not* say the fact that LeDondre survived more than one

14

hour after he was shot increased the chances his injuries could have been repaired if he had been brought to the hospital sooner.

**{¶56}** Further, appellant's flight from the crime scene provided additional evidence of his guilt. Soon after Lavetta heard the gunshots, she saw appellant running down the hall toward the front door carrying a gun. Appellant ran out of the house; jumped into a truck that was waiting for him; and was driven away from the scene. It is well settled that a defendant's flight after the commission of a crime is admissible as evidence of his consciousness of guilt and thus of guilt itself. *State v. Cline*, 11th Dist. Trumbull No. 2007-T-0052, 2008-Ohio-1500, ¶60.

**{¶57}** The state also presented evidence of appellant's motive to commit these purposeful killings. Carlton said appellant told him that Elliot had sold him bad drugs; that he, appellant, could not allow that to happen; and that something was going to have to give. In addition, Trayvon testified that appellant was upset because Elliot had sold him bad drugs and was supposed to make it up to him. Trayvon also said appellant called him later that night and said he "got a bitch."

**{¶58}** Further, LeDondre's body was found close to the door leading from the kitchen to the living room and he was shot in the back. From these facts, the jury could reasonably infer that appellant shot LeDondre while he was fleeing from the kitchen in order to prevent LeDondre from leaving the house.

**{¶59}** While the state thus presented evidence that these were purposeful killings, there is no *evidence* in this record that appellant killed the victims by accident or some other non-purposeful method. Thus, no evidence was presented that would reasonably support both an acquittal of murder and a conviction of involuntary

15

manslaughter. Appellant was therefore not entitled to a charge on involuntary manslaughter. *Ziegler, supra*; *Wine, supra*.

**{¶60}** We agree with the following reason provided by the trial court for not giving the involuntary manslaughter instruction:

> **{¶61}** The entry wounds, one was in the back, and one was in the upper shoulder. But it's all in the upper torso * * *. This is where your vital organs are located. There's no evidence in this case that there was a warning shot fired that might have ricocheted or somebody was only intending to injur[e] and not kill. Nothing to support any finding of that nature. We have the autopsy reports, the nature of the wounds and there's nothing to mitigate a purposeful killing here. So, therefore, any lesser included offense is not warranted.

**{¶62}** We therefore hold the trial court did not abuse its discretion in declining to charge the jury on involuntary manslaughter.

**{¶63}** Appellant's first assignment of error is overruled.

**{¶64}** For his second assigned error, appellant contends:

**{¶65}** "The jury's decision to find Mr. Smith guilty of murder is against the manifest weight of the evidence."

**{¶66}** A court reviewing the manifest weight observes the entire record, weighs the evidence and all reasonable inferences, and considers the credibility of the witnesses. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The court determines whether, in resolving conflicts in the evidence and deciding witness credibility, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id.* The discretionary power to grant a new trial should only be exercised in the exceptional case in which the evidence weighs heavily against the conviction. *Id.* Witness credibility rests solely with the finder of fact, and an appellate court is not permitted to substitute its judgment for that of the

16

jury. *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). "The jury is entitled to believe all, part, or none of the testimony of any witness." *State v. Archibald*, 11th Dist. Lake Nos. 2006-L-047 and 2006-L-207, 2007-Ohio-4966, ¶61. The role of the reviewing court is to engage in a limited weighing of the evidence in determining whether the state properly carried its burden of persuasion. *Thompkins, supra,* at 390. If the evidence is susceptible to more than one interpretation, an appellate court must interpret it in a manner consistent with the verdict. *State v. Banks*, 11th Dist. Ashtabula No. 2003-A-0118, 2005-Ohio-5286, ¶33.

{¶67} Appellant argues that the state failed to present any evidence that he purposely killed the victims. However, this argument is defeated by the evidence outlined in the discussion of the first assigned error.

{¶68} Appellant also suggests the jury lost its way in finding Carlton and Trayvon's testimony credible. While these witnesses were involved in the drug world and hoped to receive favorable consideration in their pending drug cases in exchange for their testimony, they (and Detective Cellitti) testified they were not promised anything in exchange for their cooperation. It is not uncommon for the state to present the testimony of associates of a criminal defendant, and there was nothing so unusual about Carlton and Trayvon that they were disqualified from testifying. Moreover, in determining the credibility of these witnesses, the jury was entitled to consider that appellant failed to present any evidence disputing their testimony.

{¶69} Based on the foregoing, this is not the exceptional case in which the evidence weighs heavily against the conviction such that the verdict was against the manifest weight of the evidence. The jury, as the trier of fact, was entitled to believe the

17

officers, lay witnesses, and expert witnesses, which it obviously did. In doing so, we cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that appellant is entitled to a new trial.

{¶70} Appellant's second assignment of error is overruled.

{¶71} For his third and final assignment of error, appellant alleges:

{¶72} "The trial court committed reversible error when it sentenced Mr. Smith to consecutive life terms."

{¶73} Post-H.B. 86, in reviewing felony sentences, this court applies the standard set forth in R.C. 2953.08(G)(2). *State v. Marcum,* 146 Ohio St.3d 516, 2016-Ohio-1002, ¶1, 16; *State v. Moore*, 11th Dist. Geauga No. 2014-G-3183, 2014-Ohio-5182, ¶29. That statute provides:

{¶74} The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard of review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

{¶75} (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant; [or]

{¶76} (b) That the sentence is otherwise contrary to law.

{¶77} While appellant argues the trial court erred in imposing consecutive sentences, he does not argue the court failed to make the necessary findings for consecutive sentences. Instead, his only argument is that the trial court erred because it did not consider the seriousness factors in R.C. 2929.12 in determining his sentence.

18

{¶78} This court, in *State v. Brown*, 11th Dist. Lake No. 2014-L-075, 2015-Ohio-2897, ¶34, addressed the trial court's obligation with respect to the seriousness and recidivism factors in R.C. 2929.12, as follows:

{¶79} The Supreme Court of Ohio in *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, held that R.C. 2929.11 and R.C. 2929.12 do not mandate judicial fact-finding. *Foster* at ¶42. Rather, *"[t]he court is merely to 'consider' the statutory factors."* (Emphasis added.) *Id.* Thus, in sentencing a defendant for a felony, "a court is merely required to 'consider' the purposes and principles of sentencing in R.C. 2929.11 and the statutory * * * factors set forth in R.C. 2929.12." *State v. Lloyd*, 11th Dist. Lake No. 2006-L-185, 2007-Ohio-3013, ¶44. The trial court satisfies its obligation to consider the seriousness and recidivism factors in R.C. 2929.12 by stating that it considered them. *State v. Whitman*, 11th Dist. Lake No. 2011-L-131, 2012-Ohio-3025, ¶12-13; *State v. DeNiro*, 11th Dist. Lake Nos. 2012-L-121 and 2012-L-122, 2013-Ohio-2826, ¶26-27.

{¶80} Here, the trial court stated on the record during the sentencing and in its judgment of conviction that it considered the seriousness factors in R.C. 2929.12. Thus, the court satisfied its obligation under that statute. Moreover, during appellant's sentencing, the court expressly considered these factors. First, the court considered the "more serious" factors in R.C. 2929.12(B). The court noted the physical or mental injury suffered by the victims due to the conduct of the offender and the nature of the injury. The court noted that the injuries were the "maximum" for both victims because these "two young men * * * lost their lives." Thus, the court stated the victims suffered serious physical injury. Further, the court noted the offender's relationship with the victims facilitated the offenses because they were all dealing drugs. The court also noted that certain more serious factors did not apply. Specifically, the court stated that the victims were not public office holders; their occupations had nothing to do with the offenses; they did not have professional reputations or occupations; and they were not

19

elected people. Further, the court stated the offenses were not for hire and were not motivated by any racial, ethnic, gender, sexual, or religious prejudice. Next, the court considered the "less serious" factors in R.C. 2929.12(C). The court noted that nothing happened that would justify taking the lives of the victims. Further, the court noted there was no provocation for these offenses. The court stated that no grounds were shown to mitigate appellant's conduct. Thus, contrary to appellant's argument, the court considered the seriousness factors on the record in imposing appellant's sentence.

{¶81} Appellant argues that because the court said at sentencing, "[i]f you're going to kill multiple people, there's multiple penalties that are going to be imposed," his sentence was improper because it suggested a "one sentence for all" approach. However, the court made this statement in connection with its decision to impose consecutive sentences. Since the court made the necessary findings for consecutive sentences, this isolated statement was superfluous and, if erroneous, harmless beyond a reasonable doubt.

{¶82} Further, while neither party raised the issue, the court's judgment of conviction did not order the firearm specification to be served consecutively to the terms imposed for his murder convictions. Although the court stated on the record that the mandatory, three-year prison sentence for this specification "will be served first, before he begins the 15 year to life sentence," no such statement was made in the court's judgment of conviction. The judgment entry merely said the three-year term was mandatory. By statute, the mandatory three-year firearm specification must be served "consecutively to and prior to" any prison term imposed for the underlying felony. R.C. 2929.14(C)(1)(a). We therefore modify the court's judgment to state that the three-year

20

mandatory term for this specification shall be served consecutively and prior to the prison terms imposed for appellant's conviction of the two counts of murder.

{¶83} In view of the foregoing, this court does not clearly and convincingly find that appellant's sentence was contrary to law.

{¶84} Appellant's third assignment of error is overruled.

{¶85} For the reasons stated in this opinion, it is the order and judgment of this court that the judgment of the Ashtabula County Court of Common Pleas is hereby modified and affirmed as modified.

THOMAS R. WRIGHT, J., concurs,

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

_____

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

{¶86} I disagree with the majority regarding appellant's first assignment of error. I believe the facts would sustain a jury instruction on the lesser included offense of involuntary manslaughter. Trials in our system require juries to find the facts and determine the guilt or innocence of defendants. *State v. Osborne*, 10th Dist. Franklin No. 75AP-423, 1976 Ohio App. LEXIS 6647, *19 (June 24, 1976). Juries, not judges, are best suited to this task. *See, e.g., State v. Charley*, 7th Dist. Belmont No. 05 BE 34, 2007-Ohio-1108, ¶90. For this reason, I dissent on the first assignment of error, and would reverse and remand for a new trial. Further, I would not reach the other assignments of error.

21