[Cite as *State v. Hope a.k.a. Johnson*, 2019-Ohio-2174.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2018-T-0053** |
| SHAWN HOPE a.k.a SHAWN JOHNSON, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Trumbull County Court of Common Pleas, Case No. 2017 CR 00252.

Judgment: Affirmed and remanded.

*Dennis Watkins*, Trumbull County Prosecutor, *Christopher Becker*, Assistant Prosecutor, and *Ashleigh Musick*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*Wesley C. Buchanan*, Buchanan Law, Inc., 195 South Main Street, Suite 202, Akron, OH 44308 (For Defendant-Appellant).

MARY JANE TRAPP, J.

{¶1} Appellant, Shawn Hope a.k.a. Shawn Johnson ("Mr. Hope"), appeals his convictions on aggravated murder, aggravated robbery, and kidnapping, each with a firearm specification, having weapons while under disability, and tampering with evidence, following a jury trial in the Trumbull County Court of Common Pleas, as well as the consecutive sentences imposed on the three firearm specifications.

**{¶2}** We find: (1) the evidence was sufficient to support Mr. Hope's convictions for aggravated murder and tampering with evidence; (2) Mr. Hope's convictions were supported by the manifest weight of the evidence; (3) Mr. Hope did not establish ineffective assistance of counsel as a result of his trial counsel's failure to request a jury instruction on involuntary manslaughter; (4) Mr. Hope did not establish his trial counsel had an actual conflict of interest that resulted in ineffective assistance; (5) Mr. Hope did not establish the prosecutor committed any misconduct during his comments at trial; (6) a mistake in the jury verdict forms did not void Mr. Hope's sentences on the firearm specifications; and (7) the trial court properly utilized its discretion in imposing consecutive sentences on the firearm specifications. Although we find the trial court properly made the required statutory findings regarding consecutive sentences at the sentencing hearing, one of the findings is missing from its sentencing entry.

**{¶3}** For the reasons that follow, we affirm the judgment of the Trumbull County Court of Common Pleas but remand for the issuance of a nunc pro tunc entry.

### Substantive History and Procedural Background

**{¶4}** On December 1, 2016, Mr. Hope was playing cards with Alicia Binion, Tabitha Powell, and John Paul Kellar at a house located at 2313 Stephens Avenue, NW in Warren, Ohio. Ms. Binion resided at the house with Mr. Kellar, whom she described as her cousin, and Ms. Powell, who was engaged to Mr. Kellar. Ms. Binion was acquainted with Mr. Hope because she had been a drug user and purchased drugs from him.

**{¶5}** At some point, Mr. Hope made advances toward Ms. Powell and Ms. Binion, and he and Mr. Kellar began arguing. The argument lasted only a few minutes and was resolved. Ms. Binion eventually asked Mr. Hope to leave the residence, which he did.

2

{¶6}     The following day, Ms. Binion, Ms. Powell, and Mr. Kellar were at the Stephens Avenue residence.  Ms. Powell was in the back bedroom with Mr. Kellar rubbing his feet.  Ms. Binion was getting ready to leave the residence to obtain money for the purchase of drugs.

{¶7}     At approximately 6:30 p.m., Mr. Hope knocked on the door.  Ms. Binion did not want to answer the door, but Mr. Kellar told her to do so.  After Ms. Binion answered the door, Mr. Hope came inside and asked where Mr. Kellar and Ms. Powell were located.  He began walking toward the back bedroom.  Mr. Kellar walked out into the hallway to meet him.  Mr. Hope had his hands in his coat pockets.  Suddenly, Mr. Hope removed a gun from his coat pocket and shot Mr. Kellar twice in the chest area at close range.  Mr. Hope then said, "Who's the bitch now?" and kicked Mr. Kellar.

{¶8}     Mr. Hope then pointed the gun at Ms. Powell and demanded she give him the keys to her van.  He grabbed her by the hair and threw her against the wall.  Ms. Binion eventually gave the keys to Mr. Hope.

{¶9}     Mr. Hope forced the two women into the van by gunpoint.  He ordered Ms. Powell to drive the van a few streets over and had the two women get out, walk through some backyards, and lie down on their stomachs on the porch of a house on Ward Street.

{¶10}  Mr. Hope knocked on the window of the house, and Rashaan Shipp came to the door.  Mr. Hope asked him for "another clip," and Mr. Shipp refused.

{¶11}  The trio returned to the van, and Mr. Hope drove them to a drive-thru to purchase cigarettes.  He then drove to a gas station on Market Street.  Mr. Hope and Ms. Binion entered the gas station while Ms. Powell stayed in the back seat.  Ms. Powell seized the opportunity to escape the van and hide underneath a vehicle parked across

the street. She eventually ran to a residence, where a woman placed a 9-1-1 call on her behalf.

{¶12} Officer Mason Henline of the Warren Police Department was dispatched to Market Street and met with Ms. Powell. She got in his cruiser and took him to the Stephens Avenue residence. In securing the residence, Officer Henline found Mr. Kellar inside the house. He was not breathing and had no pulse. According to the coroner's report, Mr. Kellar died from multiple gunshot wounds.

{¶13} Detectives Carney and Laprocina were dispatched to the Stephens Avenue residence to investigate. Detective Carney also issued a country-wide alert for Mr. Hope and the van. At the residence, there were no signs of a fight or a struggle. The detectives discovered and collected two fired cartridge cases and two fired bullets.

{¶14} Meanwhile, back at the gas station, Mr. Hope realized Ms. Powell had escaped from the van. Mr. Hope decided he and Ms. Binion had to go to Detroit, Michigan, his hometown.

{¶15} Mr. Hope drove the van as he and Ms. Binion traveled from Warren, Ohio toward Detroit, Michigan via the turnpike. Mr. Hope attempted to exit the turnpike in the Toledo area but was unable to pay the toll and had no driver's license. The toll booth attendant informed Mr. Hope she was required to call the state highway patrol. Mr. Hope pulled off near a rest area, left the vehicle, and kicked the gun under a salt bin.

{¶16} Mr. Hope and Ms. Binion eventually arrived in Detroit via a different route. They stayed there for ten days and moved from place to place doing drugs. They eventually left the van on the side of the road, and it was never recovered. Mr. Hope also asked Ms. Binion to write a letter saying he shot Mr. Kellar in self-defense.

4

{¶17} At some point, Mr. Hope permitted Ms. Binion to leave, and they separated. She walked to a store, and a couple bought her a bus ticket back to Warren, Ohio. The next morning, on December 14, 2016, she went to the Warren Police Department.

{¶18} Ms. Binion took Detectives Carney and Laprocina to the area on the turnpike where Mr. Hope had disposed of the gun. A toll booth collector, however, had discovered the gun under the salt bin on December 5, 2016 and gave it to Trooper Cheryl Myers of the Ohio State Highway Patrol. Detective Laprocina eventually retrieved the gun from the Ohio State Highway Patrol.

{¶19} Michael E. Roberts, a forensic scientist at the Ohio Bureau of Criminal Investigation ("Ohio BCI"), examined the gun, bullets, and cartridge cases that were submitted for analysis. Mr. Roberts concluded the gun was operable and the submitted bullets and cartridge cases were fired from the submitted gun.

{¶20} Hallie Dreyer, a forensic scientist at Ohio BCI, conducted DNA analysis on the gun, the two fired cartridge cases, and the front exterior screen door handle. Using Y-STR DNA testing, Ms. Dreyer obtained a partial DNA profile from one of the cartridge cases that was consistent with Mr. Hope.

{¶21} An arrest warrant for murder was issued for Mr. Hope. On March 30, 2017, Officer Jason Matter of the Michigan State Police and the Fugitive Apprehension Team was assisting the Northern Ohio Violent Fugitive Task Force in locating and apprehending Mr. Hope in Detroit, Michigan. A male fitting Mr. Hope's description was seen getting into a vehicle leaving the location they were observing. Officer Matter requested that Mr. Hope stop, but he fled instead. The officers set up a perimeter of the area and conducted house-to-house searches. Officer Michael Knox eventually apprehended Mr. Hope, who

5

was hiding under a porch. Detectives Carney and Crites subsequently transported Mr. Hope back to Warren, Ohio.

{¶22} The Trumbull County Grand Jury indicted Mr. Hope on two counts of aggravated murder, each with a firearm specification (Counts 1 and 2)[1], aggravated robbery with a firearm specification (Count 3), two counts of kidnapping, each with a firearm specification (Counts 4 and 5), having weapons while under disability (Count 6), and tampering with evidence (Count 7).

{¶23} Mr. Hope pleaded not guilty, and after a number of continuances to permit additional discovery, the case proceeded to a jury trial.

{¶24} The state presented testimony from Ms. Powell and Ms. Binion regarding the events prior to, during, and following the shooting. The state also introduced the surveillance footage from the gas station on Market Street and from the toll both on the turnpike.

{¶25} Rashaan Shipp testified regarding Mr. Hope's visit to his residence after the shooting when Mr. Hope asked him for additional bullets.

{¶26} Officer Henline testified regarding his interactions with Ms. Powell following her 9-1-1 call and the police department's securing of the Stephens Avenue residence.

{¶27} Detectives Carney and Laprocina testified regarding their investigation and the collection of evidence.

{¶28} Eva Linver of the Ohio Turnpike Commission testified about her interaction with Mr. Hope at the toll booth when he was attempting to drive to Detroit, Michigan. Ms.

---

1. The indictment contained alternative theories of aggravated murder. Count 1 charged murder with "prior calculation and design" under R.C. 2903.01(A), and Count 2 charged "felony murder" under R.C. 2903.01(B).

6

Linver, as well as her co-worker, Linda Haar, also testified regarding the discovery a few days later of Mr. Hope's gun behind the salt bin near the Ohio Turnpike Commission building. Trooper Cheryl Myers testified regarding her collection of the gun.

{¶29} Michael E. Roberts and Hallie Dreyer from Ohio BCI testified regarding their examination and analysis of the evidence.

{¶30} Dr. Humphrey Germaniuk, the Trumbull County Coroner, testified regarding his autopsy of Mr. Kellar.

{¶31} Finally, Officers Matter and Knox testified regarding their team's ultimate apprehension of Mr. Hope in Detroit, Michigan.

{¶32} The defense rested without calling any witnesses.

{¶33} The jury found Mr. Hope guilty on all the counts and specifications contained in the indictment.

{¶34} The trial court determined Counts 1 and 2 and Counts 3 and 4 merged for purposes of sentencing. The state elected to proceed on Counts 2 and 3.

{¶35} The trial court subsequently sentenced Mr. Hope to an aggregate prison term of 44 years to life. Specifically, the trial court imposed (1) 25 years to life on Count 2, plus three years for the firearm specification to be served prior to and consecutive to the life sentence, (2) five years on Count 3, plus three years for the firearm specification, to be served prior to and consecutive to the sentence imposed on Count 2, (3) five years on Count 5, plus three years for the firearm specification, to be served prior to and consecutive to the sentences imposed on Counts 2 and 3, and (4) 36 months each on Count 6 and 7, to be served concurrently with the sentence imposed on Count 2.

{¶36} Mr. Hope now appeals, asserting the following six assignments of error:

{¶37} "[1.] The evidence against Shawn was insufficient to support his convictions.

7

{¶38} "[2.] Shawn's convictions were not supported by the manifest weight of the evidence.

{¶39} "[3.] Shawn's sentence was contrary to law.

{¶40} "[4.] Shawn received ineffective assistance of counsel.

{¶41} "[5.] The jury verdict forms were incorrect.

{¶42} "[6.] The Prosecutor committed misconduct by characterizing Shawn as a monster."

### Sufficiency of the Evidence

{¶43} In his first assignment of error, Mr. Hope claims the state failed to produce sufficient evidence to sustain his convictions for aggravated murder and tampering with evidence. With respect to aggravated murder, Mr. Hope argues the state did not produce sufficient evidence of prior calculation and design. With respect to tampering with evidence, Mr. Hope argues the state did not produce sufficient evidence that he knowingly tampered with evidence.

{¶44} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶45} A sufficiency challenge requires this court to review the record to determine whether the state presented evidence on each of the elements of the offense. *State v. Muncy*, 11th Dist. Ashtabula No. 2011-A-0066, 2012-Ohio-2830, ¶13. This test involves

8

a question of law and does not permit us to weigh the evidence. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

### *Aggravated Murder*

**{¶46}** To convict Mr. Hope of aggravated murder, the state was required to prove beyond a reasonable doubt that Mr. Hope did purposely, and with prior calculation and design, cause the death of Mr. Kellar. R.C. 2903.01(A). Mr. Hope argues the state did not produce sufficient evidence of the element of prior calculation and design to support his conviction for aggravated murder.

**{¶47}** Under prior Ohio law, "murder in the first degree" required proof of "deliberate and premeditated malice." *State v. Taylor*, 78 Ohio St.3d 15, 18 (1997) citing former R.C. 2901.01. Under this standard, "a killing could be premeditated even though conceived and executed on the spur of the moment. The only requirement was that the malicious purpose be formed before the homicidal act, however short in time." *State v. Cotton*, 56 Ohio St.2d 8, 11 (1978).

**{¶48}** Effective January 1, 1974, the General Assembly reclassified first-degree murder as "aggravated murder" and substituted a requirement of "prior calculation and design" in place of "deliberate and premeditated malice." *Taylor* at 18. According to the Supreme Court of Ohio, "prior calculation and design" is a more stringent element. *Id.* at 19, citing *Cotton* at paragraph one of the syllabus. The General Assembly's apparent intention "was to require more than a few moments of deliberation * * * and to require a scheme designed to implement the calculated decision to kill." *Id.*, quoting *Cotton* at 11.

**{¶49}** The phrase "prior calculation and design" is not defined in the Revised Code. *Cotton* at 10. By its own terms, the phrase suggests "advance reasoning to formulate the purpose to kill. Evidence of an act committed on the spur of the moment or

9

after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, ¶18.

**{¶50}** There is also no bright-line test to determine whether prior calculation and design are present. *Taylor* at 20. Rather, each case must be decided on a case-by-case basis. *Id.*

**{¶51}** The Supreme Court of Ohio has held, "[w]here evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *Cotton* at paragraph three of the syllabus.

**{¶52}** The Supreme Court of Ohio has also considered three factors in determining whether a defendant acted with prior calculation and design: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?'" *Walker* at ¶20, quoting *Taylor* at 19.

**{¶53}** Mr. Hope argues that the consideration of these three factors does not support a finding of prior calculation in design. We disagree.

**{¶54}** With respect to the first factor, Mr. Hope claims the relationship between Mr. Kellar and himself was not strained. In support, Mr. Hope cites the testimony of Ms. Powell describing the night before the shooting. According to the testimony, Mr. Kellar

10

and Mr. Hope had argued but stopped after a few minutes and began joking with each other.

{¶55} Mr. Hope fails to acknowledge the testimony regarding the shooting itself, which indicated Mr. Hope arrived unexpectedly and uninvited at the Stephens Avenue residence, almost immediately shot Mr. Kellar twice in the chest area at close range, said "Who's the bitch now?," and kicked Mr. Kellar. These actions created a strong inference Mr. Hope was harboring some type of grudge against Mr. Kellar from the night before or from another event, which is evidence of a strained relationship. *See State v. Worley*, 8th Dist. Cuyahoga No. 103105, 2016-Ohio-2722, ¶18 (evidence defendant harbored a grudge against the victim inferred prior calculation and design).

{¶56} With respect to the second factor, Mr. Hope argues there was no evidence presented that demonstrated he "had picked the house for the killing or a gun for any specific purpose."

{¶57} The testimony establishes Mr. Hope apparently armed himself and, uninvited and unannounced, went to the Stephens Avenue residence where he knew Mr. Kellar lived. Upon entering the house, he immediately proceeded toward the room where he knew Mr. Kellar was present. He then shot Mr. Kellar prior to any conversation taking place between the two men.

{¶58} When a person takes a gun to a place where he knows the victim frequents, this creates a reasonable inference that a person carried the gun with an intention to use it. *See Taylor*, *supra*, at 22 (defendant took a gun into a bar where he knew victim frequently drank). In this case, it is difficult to infer anything from the evidence other than Mr. Hope armed himself and arrived at the house specifically to commit murder.

11

{¶59} With respect to the third factor, Mr. Hope argues that since "the killing happened almost instantaneously" after he entered the house, he did not act with prior calculation and design.

{¶60} This evidence actually supports an opposite inference. The killing itself may have been an "almost instantaneous eruption" after Mr. Hope entered the residence. However, the events between Mr. Hope and Mr. Kellar began at least as early as the previous evening. After Mr. Hope left the house the night before, the testimony establishes no one had any contact with him until he appeared at the house the next evening. The presence of sufficient time and opportunity for the planning of a murder between these events creates a reasonable inference of prior calculation and design. *See State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, ¶64 (sufficient time for reflection following an argument showed deliberation and planning).

{¶61} When this evidence is taken together and viewed in a light most favorable to the state, a rational trier-of-fact could reasonably conclude Mr. Hope acted with prior calculation and design.

### *Tampering with Evidence*

{¶62} To convict Mr. Hope of tampering with evidence, the state was required to prove beyond a reasonable doubt that Mr. Hope, (1) knowing an official proceeding or investigation was in process, or was about to be or likely to be instituted, (2) altered, destroyed, concealed, or removed any record, document, or thing, and (3) with purpose to impair its value or availability as evidence in such proceeding or investigation. R.C. 2921.12(A)(1).

{¶63} The charge of tampering with evidence arose from Mr. Hope's disposal of his gun under a salt bin near a turnpike exit in the Toledo area. Mr. Hope argues that

12

since he was "proceeding on a self-defense theory," which is "not a crime in Ohio," it was possible he "did not know he was tampering with evidence."

**{¶64}** It appears Mr. Hope is arguing the state did not produce sufficient evidence to prove the first element of the charge, i.e., that he had knowledge of an official proceeding or investigation, and perhaps the second element, i.e., that he had a purpose to impair the gun's availability as evidence in that proceeding or investigation.

**{¶65}** With respect to the first element, the likelihood of an investigation is measured at the time of the alleged tampering. *State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, ¶19. To have knowledge, Mr. Hope must have been "*aware* that conduct will probably cause a certain result or will probably be of a certain nature or that circumstances probably exist." (Emphasis sic.) *State v. Barry*, 145 Ohio St.3d 354, 2015-Ohio-5449, ¶24, citing R.C. 2901.22(B).

**{¶66}** The Supreme Court of Ohio has determined "Ohio law does not impute constructive knowledge of an impending investigation based solely on the commission of an offense, and therefore, the fact that an act was unmistakably a crime does not, by itself, establish that the accused knew of an investigation into that crime or that such an investigation was likely to be instituted." *Id.* at ¶2.

**{¶67}** The court has further held "knowledge of a likely investigation may be inferred when the defendant commits a crime that *is* likely to be reported." (Emphasis sic.) *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, ¶116-117 ("As a matter of common sense, we can infer that a person who had shot two people and left them for dead in a residential neighborhood would know that an investigation was likely"). According to the court, "[h]omicides are highly likely to be discovered and investigated. Certainly, a jury may reasonably believe that a murderer knows this." *Id.* at ¶118.

**{¶68}** Although Mr. Hope claims he killed Mr. Kellar in self-defense, the same principles apply. Under Ohio law, self-defense is an affirmative defense which privileges the defendant "to use that force which is reasonably necessary to repel the attack." *State v. Fambro*, 11th Dist. Trumbull No. 2016-T-0063, 2017-Ohio-5646, ¶66, quoting *State v. Williford*, 49 Ohio St.3d 247, 249 (1990). Just because Mr. Hope may have believed he could establish an affirmative defense to murder at trial does not mean he did not know the shooting would be investigated.

**{¶69}** A person is aware a crime will likely be investigated where it "involves crimes with persons likely to complain or where discovery and investigation is almost certain to occur due to the death of or severe injury to the victim." *State v. Wilson*, 4th Dist. Lawrence No. 16CA12, 2018-Ohio-2700, ¶39, citing *State v. Crocker*, 4th Dist. Scioto No. 14CA3640, 2015-Ohio-2528, ¶36. There can be no dispute Mr. Hope shot and killed a person. According to the Supreme Court of Ohio, Mr. Hope's knowledge of a likely investigation was therefore inferred by law. *See Martin* at ¶117-118.

**{¶70}** Even if Mr. Hope's knowledge was not inferred by law, the evidence in the record created a strong inference he was aware of a likely investigation. For example, in *Wilson*, *supra*, the defendant "shot [the victim] inches from his face in front of two witnesses, ran from the residence, immediately fled the state, and was eventually apprehended by the U.S. Marshals Service in West Virginia. Wilson knew that two acquaintances saw him shoot [the victim]." *Id.* at ¶39. Thus, the Fourth District determined that when Wilson disposed of the gun, he "was aware that his conduct would probably result in a murder investigation." *Id.*

**{¶71}** Mr. Hope shot Mr. Kellar twice in the chest area while two acquaintances were present, including one eyewitness who was the victim's fiancé and another witness

who described herself as the victim's cousin. He then kidnapped them at gunpoint, fled the residence, and stole Ms. Powell's van. Once he discovered Ms. Powell had escaped from the van at the gas station, Mr. Hope "freaked out" and immediately fled the state with Ms. Binion. Mr. Hope was eventually apprehended by the Michigan State Police and the Fugitive Apprehension Team.

{¶72} According to the Supreme Court of Ohio, "the fact of an accused's flight * * * [is] admissible as evidence of consciousness of guilt, and thus of guilt itself." (Citations omitted.) *State v. Williams*, 79 Ohio St.3d 1, 11 (1997). As in *Wilson*, the evidence created a strong inference that when Mr. Hope disposed of his gun on his way to Detroit, he was well-aware his conduct from that evening would result in a murder investigation.

{¶73} With respect to the third element of tampering with evidence, the state must prove Mr. Hope had purpose to impair the gun's value or availability as evidence in the proceeding or investigation. R.C. 2921.12(A)(1). "A person acts purposely when it is the person's specific intention to cause a certain result[.]" R.C. 2901.22(A). "Purpose * * * can be established by circumstantial evidence from the surrounding facts and circumstances in the case." *State v. Peak*, 11th Dist. Lake No. 2004-L-124, 2005-Ohio-6422, ¶39.

{¶74} Mr. Hope kicked the gun under a salt bin, miles away in the opposite part of the state from the location of the shooting, while he was in the process of fleeing the state. Given these circumstances, it is difficult to infer Mr. Hope intended anything other than to purposefully hide the weapon from police, who were likely investigating the shooting. *See State v. Shaw*, 8th Dist. Cuyahoga No. 105111, 2018-Ohio-403, ¶27 (defendant's concealing of a gun inside a hole in the wall of his basement was sufficient to indicate an

15

intent to hide the weapon from the police); *State v. Rankin*, 10th Dist. Franklin No. 10AP-1118, 2011-Ohio-5131, ¶19 ("Based upon the location of the gun and the difficulty in discovering it * * *, a trier of fact reasonably could conclude that defendant was actively concealing the gun with the purpose to impair law enforcement efforts to investigate the shooting").

**{¶75}** When the evidence is taken together and viewed in a light most favorable to the state, a rational trier-of-fact could reasonably conclude Mr. Hope tampered with evidence.

### Manifest Weight of the Evidence

**{¶76}** In his second assignment of error, Mr. Hope claims the jury's guilty verdicts were against the manifest weight of the evidence.

**{¶77}** The Supreme Court of Ohio explained the criminal manifest-weight-of-the-evidence standard in *State v. Thompkins*, 78 Ohio St.3d 380 (1997). *See State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶25. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. *Id.*, citing *Thompkins* at 386. Sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. *Id.*, citing *Thompkins* at 386-87. In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's? *Id.* Although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id.*, citing *Thompkins* at 387. When a court of appeals reverses a judgment of a trial court on the basis that the

16

verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Id.*

{¶78} A manifest weight challenge questions whether the state has met its burden of persuasion. *Thompkins* at 390 (Cook, J., concurring). The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. A jury is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Fetty*, 11th Dist. Portage No. 2011-P-0091, 2012-Ohio-6127, ¶58. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Fritts*, 11th Dist. No. 2003-L-026, 2004-Ohio-3690, ¶23, citing *Martin*, *supra*, at 175.

{¶79} Mr. Hope first argues that the state did not meet its "burden of production." However, Mr. Hope has misstated the applicable standard. A sufficiency inquiry analyzes whether the state met its burden of production, while a manifest-weight inquiry analyzes whether the state met its burden of persuasion. *Willoughby v. Taylor*, 180 Ohio App.3d 606, 2009-Ohio-183, ¶26 (11th Dist.). As demonstrated in our discussion of Mr. Hope's first assignment of error, the state met its burden of production at trial. In the event Mr. Hope means "burden of persuasion," he has failed to cite any portion of the record or legal authority to support this argument, in violation of App.R. 16(A)(7).

{¶80} Mr. Hope further argues that the weight of the evidence did not support Mr. Hope's convictions based on the credibility of Ms. Powell and Ms. Binion.

{¶81} With respect to Ms. Powell, Mr. Hope states that she was a heroin addict at the time of these events and was in a romantic relationship with Mr. Kellar for at least three years. Therefore, she had motive to not be as truthful as possible.

17

{¶82} With respect to Ms. Binion, Mr. Hope states that she purchased drugs from him in the past, on the night of the shooting she was leaving to obtain money for drugs, and she never saw the firearm used to kill Mr. Kellar.

{¶83} Mr. Hope's trial counsel cross-examined Ms. Powell and Ms. Binion as to their statuses as drug addicts and their relationships with Mr. Kellar. He also drew attention to inconsistencies in their testimony. Despite this evidence, the jury obviously chose to believe Ms. Powell's and Ms. Binion's version of the events. The jury was in a better position to view these witnesses and determine their credibility. We find no reason to second guess the jury's decision in this case.

{¶84} Having reviewed the record, we cannot conclude the jury, in assessing the credibility of the witnesses and resolving any conflicts in the evidence, clearly lost its way and created such a manifest miscarriage of justice warranting reversals of the findings of guilt.

{¶85} Mr. Hope's second assignment of error is without merit.

**Ineffective Assistance of Counsel**

{¶86} We will address Mr. Hope's remaining assignments of error out of order for ease of discussion.

{¶87} In his fourth assignment of error, Mr. Hope claims he received ineffective assistance of counsel in two ways. First, Mr. Hope's trial counsel did not request a jury instruction on a lesser included offense of involuntary manslaughter. Second, Mr. Hope alleges his trial counsel had a conflict of interest.

{¶88} To establish a claim of ineffective assistance of counsel, Mr. Hope must demonstrate (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability, were it not for counsel's errors, the result of the

18

proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 669 (1984).

**{¶89}** A threshold issue in a claim of ineffective assistance of counsel is whether there was actual error on the part of trial counsel. *State v. McCaleb*, 11th Dist. Lake No. 2002-L-157, 2004-Ohio-5940, ¶92. In Ohio, every properly licensed attorney is presumed to be competent, and therefore a defendant bears the burden of proof. *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989).

**{¶90}** Furthermore, decisions on strategy and trial tactics are generally granted wide latitude of professional judgment, and it is not the duty of a reviewing court to analyze the trial counsel's legal tactics and maneuvers. *State v. Gau*, 11th Dist. Ashtabula No. 2005-A-0082, 2006-Ohio-6531, ¶35, citing *Strickland* at 689. Debatable trial tactics generally do not constitute ineffective assistance of counsel. *State v. Phillips*, 74 Ohio St.3d 72, 85 (1995).

### *Jury Instruction*

**{¶91}** Mr. Hope argues that his trial counsel was ineffective by failing to request a jury instruction on involuntary manslaughter.

**{¶92}** Involuntary manslaughter is a lesser included offense of aggravated murder with prior calculation and design. *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph one of the syllabus. The only distinguishing factor is the mental state involved in the act. *Id.* at 216.

19

**{¶93}** An essential element of the offense of aggravated murder with prior calculation and design is purpose. *Id.* at 217. "A person acts purposely when it is the person's specific intention to cause a certain result[.]" R.C. 2901.22(A). By contrast, a person is guilty of involuntary manslaughter when he causes the death of another as a proximate result of committing or attempting to commit a felony. R.C. 2903.04(A); *State v. Smith*, 11th Dist. Ashtabula No. 2015-A-0027, 2016-Ohio-8420, ¶44.

**{¶94}** The Supreme Court of Ohio has held that the "[f]ailure to request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel." *State v. Griffie*, 74 Ohio St.3d 332, 333 (1996), citing *State v. Clayton*, 62 Ohio St.2d 45 (1980), certiorari denied 449 U.S. 879 (1980).

**{¶95}** The defense Mr. Hope's trial counsel articulated at trial was the state had failed to meet its burden of proof because Ms. Powell and Ms. Binion were not credible witnesses. Thus, it would appear the decision of Mr. Hope's trial counsel not to request an instruction on a lesser offense was part of the trial strategy. *See Clayton* at 47 (trial counsel's decision to seek acquittal rather than to invite conviction on a lesser offense was a matter of trial strategy). We will not second-guess trial strategy decisions that backfired. *State v. Powell*, 11th Dist. Lake No. 2007-L-187, 2009-Ohio-2822, ¶90, citing *State v. Mason*, 82 Ohio St.3d 144, 157 (1998).

**{¶96}** Further, the evidence in the case did not warrant an instruction for involuntary manslaughter as a lesser included offense. As the Supreme Court of Ohio has held, "[e]ven though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Wine*, 140 Ohio

20

St.3d 409, 2014-Ohio-3948, ¶21, quoting *Thomas*, *supra*, at paragraph two of the syllabus. "[T]he quality of the evidence offered * * * determines whether a lesser-included-offense charge should be given to a jury. *Id.* at ¶26.

{¶97} The state presented ample evidence Mr. Hope purposely caused Mr. Kellar's death. According to the testimony, as soon as Mr. Hope entered the Stephens Avenue residence, he walked toward the bedroom where Mr. Kellar was located and immediately shot him twice at close range. He also kicked Mr. Kellar and said, "Who's the bitch now?" This evidence supports an inference of purpose rather than some type of accidental or unintentional death.

{¶98} In addition, "[a] jury may infer a purpose to cause death from a defendant inflicting a wound upon a person with a deadly weapon in a manner calculated to kill." *State v. Smith*, 2016-Ohio-8420, at ¶53, quoting *State v. Wilson*, 10th Dist. Franklin No. 05AP–277, 2006-Ohio-643, ¶38. "In making such an inference, the jury may consider the places where bullets entered the victim and the resulting wounds." *Id.*, quoting *Wilson* at ¶38.

{¶99} Mr. Hope shot Mr. Kellar twice at close range with a .45 caliber handgun. According to the coroner, one shot went right in the center of his chest, perforating the right chamber of his heart. The other shot entered the left abdomen and perforated his aorta. This evidence is more than sufficient to create an inference of purpose.

{¶100} According to Mr. Hope, there was also evidence in the record to support a conviction for involuntary manslaughter.

{¶101} First, Mr. Hope references a letter from Ms. Binion stating Mr. Hope acted in self-defense. This letter cannot reasonably be construed as evidence of involuntary manslaughter. Involuntary manslaughter and self-defense are separate and distinct

21

concepts. Involuntary manslaughter is murder without the element of purpose. *Thomas*, *supra*, at 216. A person's use of force in self-defense is necessarily a purposeful act. *State v. Florence*, 2d Dist. Montgomery No. 20439, 2005-Ohio-4508, ¶49. As such, self-defense is factually inconsistent with involuntary manslaughter. *State v. Stout*, 10th Dist. Franklin No. 92AP-911, 1992 WL 385892, *3 (Dec. 22, 1992).

**{¶102}** In any event, this letter does not reasonably support a theory of self-defense. Ms. Binion testified that after Mr. Hope forced her to travel to Detroit with him, he made her write the letter. She further testified she only wrote it out of fear and disavowed its contents at trial. Therefore, Mr. Hope presented no threshold evidence of self-defense.

**{¶103}** Second, Mr. Hope references Ms. Binion's and Ms. Powell's testimony that Mr. Hope and Mr. Kellar had engaged in an argument. However, evidence of the argument does not reasonably support a conviction for involuntary manslaughter. Both Ms. Binion and Ms. Powell testified that the argument happened the day before the shooting and was rather brief. When Mr. Hope arrived the next day, there was no fighting or arguing before the shooting.

**{¶104}** No evidence was presented that would reasonably support both an acquittal of aggravated murder and a conviction of involuntary manslaughter. Mr. Hope was therefore not entitled to an instruction on involuntary manslaughter.

**{¶105}** Accordingly, the failure of Mr. Hope's trial counsel to request an instruction on a lesser-included offense of involuntary manslaughter did not amount to ineffective assistance of counsel.

### *Conflict of Interest*

{¶106} Mr. Hope argues his trial counsel was ineffective because he had a conflict of interest.

{¶107} "The term 'conflict of interest' bespeaks a situation in which regard for one duty tends to lead to disregard of another. The obvious example of this is representation of clients with incompatible interests." *State v. Manross*, 40 Ohio St.3d 180, 182 (1988). "A lawyer represents conflicting interests when, on behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose." *Id.*, citing *Columbus Bar Assn. v. Grelle*, 14 Ohio St.2d 208, 211 (1968).

{¶108} "Where there is a right to counsel, the Sixth Amendment to the United States Constitution also guarantees that representation will be free from conflicts of interest." *State v. Dillon*, 74 Ohio St.3d 166, 167 (1995). To establish a Sixth Amendment violation due to a conflict of interest, a defendant "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *State v. Getsy*, 84 Ohio St.3d 180, 187 (1998), quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).

{¶109} A possible conflict of interest is insufficient. *Id.*, citing *Cuyler* at 350. "A possible conflict of interest exists where the 'interests of the defendants may diverge at some point so as to place the attorney under inconsistent duties.'" *State v. Gillard*, 78 Ohio St.3d 548, 552-53 (1997), quoting *Cuyler* at 356. "[A]n actual conflict exists if 'during the course of representation, the defendants' interests do diverge with respect to a material fact or legal issue or to a course of action.'" *Id.* at 553, quoting *Cuyler* at 356.

{¶110} To establish an actual conflict, a defendant must show two elements. *Id.* First, he must demonstrate some plausible alternative defense strategy or tactic might have been pursued. *Id.* Second, he must demonstrate the alternative defense was

inherently in conflict with or not undertaken due to the attorney's other loyalties or interests. *Id.*

**{¶111}** Mr. Hope first argues that his trial counsel had a conflict of interest because he previously represented the victim, Mr. Kellar, in an unrelated criminal matter several years ago.

**{¶112}** Prior representation of a victim in the past does not, in and of itself, constitute a conflict of interest. *State v. Peoples*, 10th Dist. Franklin No. 02AP-945, 2003-Ohio-4680, ¶39, citing *State v. Lorraine*, 66 Ohio St.3d 414 (1993). In fact, courts that have considered the issue have determined an attorney's prior representation of a defendant's murder victim did not constitute an actual conflict of interest.

**{¶113}** In *State v. Radford*, 2d Dist. Greene No. 85-CA-72, 1987 WL 18528 (Oct. 16, 1987), the Second District found no actual conflict of interest existed as a result of trial counsel's prior representation of the murder victim in a criminal case because Radford was well-aware of the prior representation. *Id.* at *2.

**{¶114}** Similarly, in *State v. Russell*, 4th Dist. Washington No. 94 CA 1, 1994 WL 419614 (Aug. 5, 1994), the Fourth District found no actual conflict of interest existed as a result of trial counsel's prior representation of the murder victim in a traffic case because the attorney did not represent Russell and the murder victim at the same time or in related matters. *Id.* at *5. *See also State v. Dukes*, 34 Ohio App.3d 263, 264 (8th Dist.1986) (no actual conflict of interest existed where trial counsel's law partner previously represented the victim of an attempted murder, because the partner was not representing the victim at the time of trial); *Lorraine*, *supra*, at 426 (defendant did not demonstrate on record how he was prejudiced by the Public Defender Commission's prior representation of a prosecution witness).

24

{¶115} Mr. Hope's trial counsel represented Mr. Kellar several years ago in an "escape case." Mr. Hope has not demonstrated his trial counsel had an actual conflict of interest as a result of this prior representation of Mr. Kellar.

{¶116} Prof.Cond.R. 1.9(a) governs a lawyer's duty to a former client, which states "a lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a *substantially related matter* in which that person's interest are materially adverse to the interests of the former client." (Emphasis sic). A "substantially related matter" includes "one in which there is a substantial risk that *confidential factual information that would normally have been obtained in the prior representation of a client* would materially advance the position of another client in a subsequent matter. (Emphasis added.) Prof.Cond.R. 1.0(n).

{¶117} There is no indication Mr. Hope's trial counsel obtained confidential factual information regarding Mr. Kellar in the "escape case" that would have materially advanced Mr. Hope's defense. Although Mr. Hope references Mr. Kellar's alleged "propensity to violence," it is not clear that he is referring to anything other than Mr. Kellar's prior criminal convictions, which are a matter of public record and which were raised tangentially by the cross-examination of Mr. Kellar's fiancé in an unavailing effort to create evidence of self-defense. There simply was no evidence in this record of self-defense.

{¶118} Further, Mr. Hope was well-aware of the prior representation. The record indicates Mr. Hope's trial counsel informed him of the prior representation on their very first meeting, and Mr. Hope did not object.

{¶119} In support of his argument, Mr. Hope cites an advisory opinion from the Ohio Board of Professional Conduct (then known as the Board of Commissioners on Grievances and Discipline). *See* Advisory Opinion 2013-4 (Oct. 11, 2013). As Mr. Hope

25

correctly notes, the Board sought to answer the following question: "Does a lawyer's representation of a criminal defendant create a conflict of interest if the lawyer will be required to cross-examine a former client during the defendant's trial in a matter unrelated to the representation of the former client?" Mr. Hope seems to imply the answer is an unconditional "yes."

{¶120} As a preliminary issue, it is not clear the advisory opinion even applies in this case. Given Mr. Kellar's death, Mr. Hope's trial counsel was obviously not able to, much less required to, cross-examine him.

{¶121} In any event, the Board actually concluded "[w]hen a lawyer learns that a current representation may require the cross-examination of an adverse witness who is a former client, the lawyer must analyze the potential conflict under Prof.Cond.R. 1.7 and 1.9." Advisory Opinion 2013-4 at 12. In other words, the cross-examination of a former client does not automatically constitute a conflict of interest. Rather, the lawyer must determine whether an *actual* conflict exists under the Professional Rules of Conduct. Whether a conflict exists must be determined by the facts of each case. *Columbus Bar Assn. v. Ross*, 107 Ohio St.3d 354, 2006-Ohio-5, ¶26. As demonstrated above, Mr. Hope has not established that his trial counsel had an actual conflict under Prof.Cond.R. 1.9(a).

{¶122} Mr. Hope also argues that his trial counsel had an actual conflict of interest because Mr. Hope had filed a grievance against him. There is no legal authority holding that a defendant's filing of a grievance against his counsel automatically creates an actual conflict of interest. While Mr. Hope's filing of a grievance might have given rise to a *possible* conflict of interest, there was no indication an *actual* conflict did exist. *See State v. Heyward*, 4th Dist. Pickaway No. 96CA42, 1998 WL 290238, *3 (May 18, 1998). In addition, courts "must be wary of defendants who employ complaints about counsel as

26

dilatory tactics or for another invidious motive." *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, ¶33.

{¶123} In this case, the trial court held a hearing on trial counsel's motion to withdraw as a result of the grievance Mr. Hope filed against him. The trial court noted it had held 17 previous pretrial hearings in the case and the jury trial was scheduled in less than a month, which had been reset several times. The trial court further noted that permitting the withdrawal of trial counsel would result in an additional continuance, and Mr. Hope had complained in his grievance of the numerous delays in his case.

{¶124} Mr. Hope acknowledged his concerns could be resolved prior to the trial date. Therefore, the trial court appointed a senior attorney from the public defender's office to act as lead counsel in the case with trial counsel as second chair. The trial court expressly asked Mr. Hope if this was acceptable, and Mr. Hope expressly stated it was.

{¶125} Reviewing courts have found similar colloquies to be sufficient to diffuse difficult situations involving defendants and their trial counsel. *See Heyward* at *3 (trial court held a hearing and conducted inquiries after defendant filed a grievance against his trial counsel); *Ahmed* at ¶34 (trial court held a hearing and conducted inquiries after defendant filed a federal civil rights lawsuit against his trial counsel). Therefore, Mr. Hope has not established his trial counsel had an actual conflict of interest as a result of the grievance.

{¶126} Mr. Hope further argues the fact that the trial court appointed an additional attorney demonstrates there was an actual conflict of interest. However, a review of the hearing transcript indicates the trial court only appointed additional counsel because the grievance against his trial counsel was still pending. The trial court explicitly rejected Mr. Hope's claim that his trial had a conflict of interest.

27

{¶127} Finally, even if an actual conflict did exist, Mr. Hope has not demonstrated his trial counsel's performance was deficient in some way. Mr. Hope claims he "wanted to pursue a theory of self-defense," which would require his trial counsel to demonstrate Mr. Kellar's "propensity to violence and having a felony criminal history." Mr. Hope then admits his trial counsel "did attempt to use text messages to impeach Kellar's credibility and his character." In addition, the trial transcript reflects Mr. Hope's trial counsel also elicited testimony to establish Mr. Kellar's prior criminal history.

{¶128} Since Mr. Hope's trial counsel actively pursued Mr. Hope's desired defense strategy, there is no evidence his trial counsel's performance was adversely affected by any conflict of interest. *See State v. Wilson*, 5th Dist. Stark No. 2013 CA 00078, 2014-Ohio-461, ¶22 (there was no indication the grievance a defendant filed against his trial counsel affected trial counsel's professional judgment or quality of representation).

{¶129} Accordingly, Mr. Hope has not established his trial counsel had an actual conflict of interest which resulted in ineffective assistance of counsel.

{¶130} Mr. Hope's fourth assignment of error is without merit.

**Prosecutorial Misconduct**

{¶131} In his sixth assignment of error, Mr. Hope claims the prosecutor's conduct was sufficiently improper to merit reversal of his convictions. Specifically, Mr. Hope alleges the prosecutor characterized him as a "monster."

{¶132} "The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Smith*, 87 Ohio St.3d 424, 442 (2000), citing *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). The focus is "the fairness of the trial, not the culpability of the prosecutor." *Id.*, citing *Smith v. Philips*, 455 U.S. 209, 219 (1982). Thus, prosecutorial misconduct is not grounds for

28

reversal unless it so taints the proceedings that a defendant is deprived of a fair trial. *State v. Henderson*, 11th Dist. Trumbull No. 99-T-0001, 2000 WL 1459858, *3 (Sept. 29, 2000).

{¶133} Mr. Hope argues that the prosecutor characterized him as a "monster," and such comments were "improper and permeated the trial." In support, he cites two pages from the sentencing hearing transcript where Mr. Hope, not the prosecutor, addressed the trial court. During his remarks, Mr. Hope stated the prosecutor "very much disrespected me and turned me into a monster."

{¶134} Mr. Hope has failed to cite any portion of the record containing the alleged prosecutorial misconduct, in violation of App.R. 16(A)(7). It is not an appellate court's duty to guess the arguments of an appellant. *Reel v. Reel*, 11th Dist. Trumbull No. 2014-T-0023, 2014-Ohio-5079, ¶8.

{¶135} In addition, since Mr. Hope has not pointed to any specific statements, he has not demonstrated he objected to the alleged misconduct about which he now complains. *See State v. Kish*, 11th Dist. Lake No. 2001-L-014, 2002-Ohio-7130, ¶49. Therefore, he has waived all but plain error. *Id.*; Crim.R. 52(B).

{¶136} In the event Mr. Hope is referring to the prosecutor's closing argument, the prosecution is entitled to a certain degree of latitude in summation. *Smith*, 87 Ohio St.3d at 442-43, citing *State v. Liberatore*, 69 Ohio St.2d 583, 589 (1982). "In the tension and turmoil of a trial, both the prosecution and the defense have wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom." *State v. Lott*, 51 Ohio St.3d 160 (1990), quoting *State v. Stephens*, 24 Ohio St.2d 76, 82 (1970). A review of the transcript fails to reveal any prosecutorial misconduct during closing argument.

29

{¶137} Mr. Hope's sixth assignment of error is without merit.

**Verdict Forms**

{¶138} In his fifth assignment of error, Mr. Hope claims the trial court improperly sentenced him on the firearm specifications because the verdict forms were incorrect. Specifically, Mr. Hope notes that the jury wrote "guilty" instead of "did" on the three firearm specification forms.

{¶139} Mr. Hope is correct the verdict forms for the firearm specifications contain this mistake. After the jury returned its verdicts to the trial court, the trial court recognized the issue and specifically inquired of the jury:

{¶140} "Where the directions indicated that you were to place the word 'did' or the words 'did not' have a firearm, you used the word 'guilty.' Is that in place of 'did'?"

{¶141} The jury foreperson responded "Correct."

{¶142} At a side bar with counsel, the following exchange occurred:

{¶143} "[TRIAL COURT]: Again, gentlemen, as to the firearm specification, they did not answer 'did' or 'did not.' They answered 'guilty' or 'not guilty.' Now, I can send them back to correct them, or we can all agree to accept 'guilty' is 'did,' and 'not guilty' is 'did not.' From defense perspective?

{¶144} "[DEFENSE COUNSEL]: That's fine. No objection.

{¶145} "[THE STATE]: No objection."

{¶146} Mr. Hope appears to argue the mistake on the verdict forms renders the verdicts on the firearm specifications void because the trial court did not send the jury back to correct them before discharging the jury.

{¶147} However, Mr. Hope's trial counsel not only did not object to the trial court's proposed resolution of the issue, but he affirmatively consented to it. The doctrine of

30

invited error holds that a litigant may not "take advantage of an error which he himself invited or induced." *Hal Artz Lincoln–Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20 (1986), paragraph one of the syllabus. In fact, the Supreme Court of Ohio has held that invited error exists when a party has affirmatively consented to a procedure the trial judge proposed. *State v. Campbell*, 90 Ohio St.3d 320, 324 (2000). The invited error doctrine prevents Mr. Hope from now assigning as error the trial court's failure to have the jury correct the verdict forms.

{¶148} In any event, the verdict forms do not render the verdicts void. The Supreme Court of Ohio has held that "[j]ury verdicts in criminal cases are to have reasonable constructions and are not to be declared void unless from necessity originating in doubt of their import or irresponsiveness to the issue submitted, or unless they show a manifest tendency to work injustice." *State v. McNicol*, 143 Ohio St. 39 (1944), paragraph two of the syllabus.

{¶149} Despite the mistake, the intended meaning of the jury's verdict is clear—the jury found Mr. Hope had a firearm in his possession or under his control at the time he committed certain charged offenses. *See State v. Robinson*, 9th Dist. Summit No. 27480, 2015-Ohio-2376, ¶5. In addition, any lack of clarity was resolved when the jury foreperson confirmed the trial court's very reasonable and obvious construction of the verdict forms' intended meaning – "guilty" meant "did." *See State v. Ferguson*, 11th Dist. Lake No. 2015-L-031, 2015-Ohio-5217, ¶19. Therefore, the trial court did not err in accepting the verdict forms and sentencing Mr. Hope accordingly.

{¶150} Mr. Hope also argues the verdict forms did not comply with Crim.R. 31(A) or R.C. 2945.171. Crim.R. 31(A) requires a verdict be unanimous, in writing, signed by all concurring jurors, and returned to the judge in open court. R.C. 2945.171 requires the

jury's verdict in criminal cases be in writing and signed by each of the concurring jurors. The record reflects a unanimous verdict signed by all the jurors, and the jury returned the verdict to the judge in open court. Therefore, the verdict complies with Crim.R. 31(A) and R.C. 2945.171.

{¶151} Finally, Mr. Hope takes issue with the fact the jury was not polled. Crim.R. 31(D) provides that "the jury shall be polled at the request of any party or upon the court's own motion." R.C. 2945.77 provides that "the jury may be polled at the request of either the prosecuting attorney or the defendant." There is nothing in the record reflecting any party's request to poll the jury. Therefore, polling was not required.

{¶152} Mr. Hope's fifth assignment of error is without merit.

### Sentencing

{¶153} In his third assignment of error, Mr. Hope claims his sentence was contrary to law. Specifically, Mr. Hope argues the trial court failed to make the necessary findings to impose consecutive sentences for the three firearm specifications and abused its discretion in imposing the third consecutive sentence.

{¶154} Our consideration of a felony sentence is governed solely by R.C. 2953.08(G)(2). *State v. Lough*, 11th Dist. Trumbull No. 2015-T-0093, 2016-Ohio-3513, ¶10. Thus, we may only vacate or modify a felony sentence on appeal if we determine "by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶1.

{¶155} R.C. 2929.14(B)(1)(b) generally provides that multiple prison terms for firearm specifications are not permissible when the underlying felonies were "committed as part of the same act or transaction." *State v. Lewis*, 11th Dist. Lake No. 2012-L-074,

32

2013-Ohio-3974, ¶102.  An exception to this rule is set forth in R.C. 2929.14(B)(1)(g), which provides:

{¶156} "If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications."

{¶157} Under this exception, "the sentencing court must impose a prison term for two specifications * * * but may also choose to impose a term for remaining specifications." *State v. Fortune*, 11th Dist. Lake No. 2014-L-117, 2015-Ohio-4019, ¶18.  The same act or transaction requirement does not apply under such circumstances.  *Id.*

{¶158} Mr. Hope was convicted of multiple felonies, one of which was aggravated murder and another of which was aggravated robbery.  Therefore, the trial court was required to impose consecutive sentences for two separate firearm specifications.  *See id.*  While the trial court was not required to sentence Mr. Hope to a third term of imprisonment for the third specification, it had discretion to do so.  *See id.*

### Necessary Findings

{¶159} Mr. Hope first argues that the trial court failed to make the necessary findings before imposing consecutive sentences on the three firearm specifications.

33

{¶160} "On appeals involving the imposition of consecutive sentences, R.C. 2953.08(G)(2)(a) directs the appellate court 'to review the record, including the findings underlying the sentence' and to modify or vacate the sentence 'if it clearly and convincingly finds * * * [t]hat the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14 * * * of the Revised Code.'" *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶28.

{¶161} R.C. 2929.14(C)(4) provides:

{¶162} "If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

{¶163} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

{¶164} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

**{¶165}** "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."

**{¶166}** "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry." *Bonnell* at ¶37. However, "a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.* at ¶29.

**{¶167}** The trial court made the following findings at Mr. Hope's sentencing hearing:

**{¶168}** "[C]onsecutive sentences are necessary to punish you as the defendant and protect the public and are not disproportionate, as your criminal history shows that the consecutive sentences are necessary to protect the public."

**{¶169}** Thus, the record reflects that the trial court made all the required findings: the two findings required under R.C. 2929.14(C)(4) relating to protecting the public/punishing Mr. Hope and proportionality, as well as a third finding under (C)(4)(c) relating to Mr. Hope's criminal history.

**{¶170}** The sentencing entry states:

**{¶171}** "[T]he Court finds that consecutive service is necessary to protect the public from future crime and to punish the Defendant, and that consecutive sentences are not disproportionate to the seriousness of the Defendant's conduct and to the danger the Defendant poses to the public."

35

**{¶172}** The sentencing entry is missing the finding under (C)(4)(c) regarding Mr. Hope's criminal history. According to the Supreme Court of Ohio, however, "[a] trial court's inadvertent failure to incorporate the statutory findings in the sentencing entry after properly making those findings at the sentencing hearing does not render the sentence contrary to law; rather, such a clerical mistake may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court." *Bonnell* at ¶30; *see also State v. Olp*, 11th Dist. Ashtabula Nos. 2015-A-0033 & 2015-A-0034, 2016-Ohio-3508, ¶23.

**{¶173}** Accordingly, we determine that the imposition of consecutive sentences was not contrary to law, but we remand this matter to the trial court for the limited purpose of issuing a nunc pro tunc entry incorporating the findings from the sentencing hearing.

### *Abuse of Discretion*

**{¶174}** Mr. Hope also argues that the trial court abused its discretion in imposing a third term of imprisonment for the third firearm specification pursuant to R.C. 2929.14(B)(1)(g).

**{¶175}** An abuse of discretion is the trial court's "failure to exercise sound, reasonable, and legal decision-making." *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶62, quoting *Black's Law Dictionary* 11 (8th Ed.2004).

**{¶176}** During the sentencing hearing, the trial court determined: (1) Mr. Hope's criminal record demonstrated he was a "habitual criminal," (2) Mr. Hope had been incarcerated for lengthy periods of time on ten occasions at the jail level and four times in prison, (3) Mr. Hope's course of criminal conduct had spiraled into taking a person's life, (4) the kidnapping and robbery were an attempt to escape, and (5) Mr. Hope was a danger to society and needed to be taken off the streets to protect the public.

**{¶177}** In light of the above findings, we cannot say the trial court's decision to impose the additional firearm specification term was an abuse of discretion. *See State v. Isreal*, 12th Dist. Warren No. CA2011-11-115, 2012-Ohio-4876, ¶74 (the trial court did not abuse its discretion in imposing a third term of imprisonment for a third firearm specification when it considered the defendant's lengthy criminal past, that the defendant's actions caused death and danger, and that the defendant possessed a gun on his person during a car chase).

**{¶178}** Mr. Hope's third assignment of error is without merit.

**{¶179}** Based on the foregoing, the judgment of the Trumbull County Court of Common Pleas is affirmed, but we remand for the issuance of a nunc pro tunc entry.


THOMAS R. WRIGHT, P.J.,

MATT LYNCH, J.,

concur.