[Cite as *State v. Cipolla*, 2022-Ohio-4794.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

    - vs -

PHILLIP J. CIPOLLA,

        Defendant-Appellant.

**CASE NO. 2022-A-0012**

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2020 CR 00558

---

**O P I N I O N**

Decided: December 30, 2022
Judgment: Affirmed

---

*Colleen M. O'Toole*, Ashtabula County Prosecutor, and *Jessica Fross*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Joseph R. Klammer*, The Klammer Law Office, LTD., The Historic Mentor Center Street School, 7482 Center Street, Unit 6, Mentor, OH 44060 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1} Appellant, Phillip J. Cipolla, appeals the judgment sentencing him to 60 months of imprisonment after a jury found him guilty of gross sexual imposition. We affirm.

{¶2} In 2020, Cipolla was charged with one count of gross sexual imposition, a third-degree felony, in violation of R.C. 2907.05(A)(4) and 2907.05(C)(2). The charge stemmed from an allegation that he engaged in sexual contact with an eleven-year-old child in 2014.

{¶3} Cipolla entered a not guilty plea, and the case ultimately proceeded to jury trial. The jury found Cipolla guilty of the sole count, and the trial court ordered a presentence investigation and set the matter for sentencing. At sentencing, the trial court imposed the maximum sentence of 60 months of imprisonment.

{¶4} In his first assigned error, Cipolla argues:

{¶5} "Appellant was denied effective assistance of counsel at his trial."

{¶6} To prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate "(1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability, were it not for counsel's errors, the result of the proceedings would have been different." *State v. Hope*, 2019-Ohio-2174, 137 N.E.3d 549, ¶ 88 (11th Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We review the first prong, mindful that "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland* at 689. With respect to the second prong, "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

{¶7} Cipolla maintains that defense counsel was deficient in the following ways: (1) during opening statement, counsel indicated that Cipolla would be testifying and thus created a jury expectation which was not fulfilled when Cipolla did not testify, and counsel equivocated on the strength of the defense; (2) on cross-examination of the victim, counsel essentially apologized to the victim for the trauma she experienced, questioned

2

the victim in detail about the incident and elicited a more thorough description of the incident than the state, essentially "test[ed] how perfect [the victim's] memory was," and asked about force, although force was not alleged by the state and is not an element of the offense; (3) during the victim's mother's testimony, counsel failed to object when the mother provided a lengthy narrative of the changes she had witnessed in the victim after the incident, when no expert witness testified that children who have been sexually abused would act out in the ways described by the mother, and failed to cross-examine the mother on this issue, and insufficiently cross-examined mother as to why she did not believe victim and report the incident when the victim first disclosed it; (4) during cross-examination of Cipolla's ex-wife, counsel insufficiently cross-examined her in such a way as to essentially elicit testimony corroborating the victim's account of the incident; (5) during cross-examination of the investigating officer, counsel stated the sergeant was a "well-respected, well-educated officer for the police department," after the sergeant had testified as to inconsistencies in his Cipolla's statement; (6) counsel failed to properly advise Cipolla regarding his right to testify or not testify, as demonstrated by a discussion between the court and Cipolla after the defense rested; (7) during closing argument, counsel failed to appropriately identify any way in which the victim's account had changed, failed to identify the "unanswered questions" that remained, and failed to address any expectation created by opening statement that Cipolla would testify. We address the *Strickland* deficiency prong relative to many of these arguments in our discussion of the pertinent portions of trial that follow.

{¶8} During the state's opening statement, it indicated that the jury would hear testimony establishing that Cipolla, who the victim knew as "Uncle John," put his hand

3

down her shorts while they were watching television after they returned from fishing together when the victim was 10 or 11 years old.  The state maintained that the evidence would show that Cipolla rubbed the victim's vagina.  The state also indicated that the victim disclosed the abuse to her mother at that time, but her mother did not believe her until several years later.  The state maintained that the evidence would show that the victim began acting out after the incident, and she later again disclosed to her mother what had occurred.  The state indicated that a police sergeant investigated the case, and the state anticipated that the sergeant would testify that he interviewed Cipolla who made "dramatic inconsistencies" in his statement.

{¶9} At the beginning of defense counsel's opening statement, defense counsel stated:

> Ladies and Gentlemen, we're here because there are inconsistencies in statements not just on John's behalf.  We're going to find inconsistencies throughout the testimony is what I'm expecting.

{¶10} Thereafter, defense counsel referenced that the alleged incident occurred seven years prior to trial, and then stated the following:

> Uncle John, [U]ncle John is like a family member.  Uncle John is here, John is here to tell you that that's not what happened.  That's why he's here.  I didn't – I didn't grope.  I didn't sexually make contact with [the victim] for any sexual purpose, for her arousal, for my gratification. * * *

{¶11} Subsequently, defense counsel stated:

> But the evidence, what's the evidence not going to show?  I would – I would expect that you will learn through the evidence, whether John testifies or not, that yes, they've been fishing; yes, they were at the house; yes, they've watched Sponge Bob Square Pants; yes, he's been at their house afterwards and she's been at their house before; yes,

4

[Cipolla's wife at the time of the incident] does babysit, they do work at [the victim's mother's] house * * *.

{¶12} Defense counsel additionally referenced in his opening statement that the victim's mother initially did not believe the victim's accusations:

The evidence will show that [the victim] wasn't believed. The evidence will show that this was brought back up in 2018, forensic interviews, and here we are. [The victim] says, I was touched inappropriately. I told somebody, an adult. They didn't believe me. We'll find out why. * * *. And the entire time, Mr. Cipolla, that never happened. That's what he's telling you today.

{¶13} Thereafter, defense counsel stated that the determining issue involved whether Cipolla had sexual contact with the victim, which never happened. Defense counsel then stated, "That's what the facts of the case that we're looking for, what the evidence we would think that hopefully it's going to show."

{¶14} At the end of his opening statement, defense counsel requested the jury to give the case the attention it needs, because "this is highly traumatic, and I understand that, for [the victim] to come in and testify. Same with – same with Mr. Cipolla."

{¶15} With respect to Cipolla's assertions that defense counsel promised his testimony, we note that although counsel phrased his remarks in such a way that it may have indicated that Cipolla would testify, he also indicated facts that he believed the evidence would show "whether John testifies or not[.]" Reviewing counsel's remarks regarding what Cipolla was there to "tell" the jury in this context, we cannot say that defense counsel was deficient.

{¶16} Next, regarding defense counsel's cross-examination of the victim, the state called the victim as its first witness. The victim testified that Cipolla's wife at the time of the incident ("Karla"), was previously married to the victim's mother's cousin. Karla

5

Case No. 2022-A-0012

assisted in cleaning and babysitting for the victim's family. The victim referred to Cipolla as "Uncle John." Just before the victim's eleventh birthday, she went fishing with Cipolla at a lake near his house. When they returned to Cipolla's house, he made the victim a snack. The victim asked if they could watch Sponge Bob Square Pants, and they proceeded to watch the show on the television in Cipolla's bedroom. The victim lay in the middle of the bed under the covers, and Cipolla sat on the bed to her left. Cipolla then began rubbing the victim's arm, and moved his hand down her arm, and then put his hand down the victim's pants and rubbed her vagina. Cipolla asked the victim if she "liked it," and she affirmed that she did because she was scared and did not know what else to say. When Karla came home, the victim told her what had occurred, and Cipolla indicated that he did not know what the victim was talking about. Karla told the victim that it was okay, and she did not need to tell anyone else. When the victim returned home, she disclosed the incident to her mother, who did not believe her at the time. However, when the victim referenced the abuse to her mother several years later, her mother took her to the hospital.

{¶17} At the beginning of cross-examination, defense counsel introduced himself to the victim, and then stated as follows:

> I represent Uncle John in this matter, and I do have a lot of questions for you about the incident that had taken place. The questions I'm going to ask aren't to make you feel uncomfortable. They're really not. I don't want to cause you any more trauma than you've already been through. If you need a break, let me and let the Court know. Take a minute, take ten minutes, whatever, whatever you need, and then we'll go – start with some of the questioning.

{¶18} Defense counsel asked the victim several questions regarding the details of the day of the incident, most of which the victim recalled and answered, such as what

6

clothes she was wearing at that time, whether it was hot outside, whether she took any items with her to Cipolla's house, where she met Cipolla in the house that morning, the gear that Cipolla had set out for them, the clothes that Cipolla was wearing; the path they took to the lake, etc. Also, during cross-examination, the following exchange occurred:

> Q. So, on the date of this incident, John didn't give you any kind of candy, medication, alcohol to make you feel relaxed at all, did he?
>
> A. Nope.
>
> Q. Did he ever put his hands on you in some type of forceful way –
>
> A. No.
>
> Q. – to make you scared?
>
> A. When he went down my pants, yeah, that was forceful and made me scared. That's why I didn't know what to say.

{¶19} During cross-examination, defense counsel asked the victim detailed questions regarding the incident, at one point stating, "I have to – I have to ask you, like, more detailed questions, and I'm probably going to be long. We're going to go through a lot of steps." Defense counsel requested the victim draw a diagram of Cipolla's bedroom for reference during cross-examination, and she complied. Defense counsel inquired as to the positioning of Cipolla and the victim in the bedroom:

> Q. All right. So, you're laying in the middle of the bed. Are you laying or sitting up?
>
> A. Laying down.
>
> Q. So, you're laying down right here in the middle?
>
> A. Mm-hmm.
>
> Q. Fully dressed?

7

A. Mm-hmm.

Q. And then where is Uncle John?

A. He's to the left of me.

Q. So, if this is you, he's on this side?

A. Yes.

Q. So, you're here in the middle and Uncle John is on this side?

A. Yes.

Q. And you're completely under the covers?

A. Yes.

Q. All right. You had on a pillow – if you're laying perfectly laid back, then how are you able to see the Sponge Bob on the TV?

A. It was right in front of you.

Q. So, the TV's closer to you when you were laying on the bed than you and me are right now?

A. It'd be like right where that computer is.

Q. Okay.

A. That's how far it is.

Q. Did you have pillows behind your head?

A. Yeah.

Q. And the covers, were –

A. They were up here, right here.

Q. So, the covers are waist high on that?

A. Mm-hmm.

8

Case No. 2022-A-0012

Q. How was Uncle John positioned on the bed? You were laying there with the covers up at least waist high watching TV, and then he had sat on the bed?

A. Yeah, sitting up.

Q. Sitting up?

A. He was sitting up, yeah.

Q. With this table here, say this is the headboard.

A. Mm-hmm.

Q. This is the headboard, here's the bed, there's the TV. You're laying right here in the middle. Uncle John, your testimony is that he is then sitting here?

A. Yeah.

Q. And then what happens?

A. He got under the covers with me.

Q. He got under the covers with you?

A. Yeah.

Q. Fully clothed?

A. Yes.

Q. Okay. So, then he's laying there next to you under the covers?

A. Yes.

Q. What are you guys talking about at that point?

A. We were just watching Sponge Bob. We weren't talking.

Q. Okay. What happens after that?

A. He put his hands down my pants.

9

{¶20} Defense counsel further questioned the victim in detail as to how Cipolla touched her and how the two were positioned on the bed, as follows:

Q. So, he started – you're saying he rubbed your left shoulder?

A. Yeah, like this. And just kept going down.

* * *

Q. So, he was rubbing your shoulder on the outside of your T-shirt?

A. Yes.

Q. Was that unusual?

A. Yes.

Q. What hand was he using to rub your shoulder, right or left?

A. Right – or left. I mean, left.

Q. He was using his left –

A. Yes, I think so.

Q. – to rub your left?

A. I think so, yes.

Q. So, you're both under the covers now in the bed – say this is the bed – and you're both laying here. Uncle John's laying down, and I'm assuming – you tell me if I'm wrong – both of you are laying on your back, maybe pillows behind your head?

A. I'm laying on my back. He's laying straight up against the headboard.

Q. So, he's sitting straight up in the bed?

A. Yes.

Q. And you're laying down?

10

A. Yes.

Q. And he takes his left hand and starts to cross his body over and then starts rubbing your shoulder like this?

A. Yes.

Q. Okay. And that's outside of this – your T-shirt?

A. Yes.

Q. As far as your upper garments, did you have a hat on?

A. No.

Q. Did you have a bra on?

A. No. No.

Q. Did you have another T-shirt or shirt or article of clothing underneath your T-shirt?

A. No.

Q. So, you had – your testimony is you had one shirt on, and then he was rubbing the outside of your shoulder. And then, from there, he keeps going down?

A. Yes.

Q. With his left hand?

A. Yes.

Q. As he's sitting up and you're laying there.

A. Yes.

Q. So, what type of – you had shorts on?

A. Yes.

Q. You had underwear on?

A. Yes.

11

Q. So, your testimony is that – oh, you haven't testified to that yet. Then, what happens next?

A. We were laying down watching Sponge Bob, and he takes – he's rubbing my left hand – or my arm, and he keeps going down and he goes under my underwear and my shorts.

Q. So, Uncle John – so that we have a perfect understanding of your best recollection about what had happened, Uncle John is sitting up like this on the bed, [the victim] laying right here kind of the middle of the bed both watching Sponge Bob, no conversation, Uncle John starts rubbing your left shoulder, you have your shirt on, and he's going down your arm?

A. (The Witness nodded her head affirmatively.)

Q. How many times does he do this?

A. He just slowly goes down.

Q. Slowly goes down?

A. Mm-hmm.

Q. And then your arms are outside of the covers or under the covers?

A. I think inside the covers.

Q. So, you have the covers kind of pulled up here?

A. No, it's like this. I'm just laying like this. Yeah.

Q. So, the covers are coming up, like, midways?

A. Yeah.

Q. But your hands and stuff are still under the covers, so maybe from the elbow up?

A. Yeah.

Q. That's fair to say?

A. (The Witness nodded her head affirmatively.)

12

Case No. 2022-A-0012

Q. So, then Uncle John's rubbing here, and then just from this point he makes his way straight down to –

A. Yeah. He crosses my body and he goes straight down.

Q. So, then Uncle John is – he goes down your shirt?

A. No, not down my shirt. Outside of my shirt. Just under my underwear and my shorts.

Q. So, he is on the outside of your shirt?

A. Yes.

Q. He follows that down and goes underneath the covers, and then goes down underneath the covers then to your waistline, and then he puts his hands in the front of your pants and starts rubbing?

A. Mm-hmm.

Q. And nothing is being said at this time by Uncle John to you?

A. He asked me if I liked it.

Q. And you said no?

A. I said yes.

Q. You said you liked it?

A. I didn't know what else to say.

{¶21} Defense counsel then inquired as follows:

Q. Now, Uncle John – I'm sorry to be redundant – he's sitting there, you're in the middle, he's using his left hand, crosses your left should, arm, comes down into your shorts, so now his hand is underneath the cover and your shorts. There is no penetration by Uncle John into your vagina; is that correct?

A. Yes.

Q. So, he – he did not enter your vagina with any of his fingers?

13

Case No. 2022-A-0012

A. No.

Q. Or with anything else?

A. No.

\* \* \*

Q. Now, then his left hand is now going under the covers. Did he put his whole hand inside of your shorts and underwear?

A. Mm-hmm.

Q. And palm down?

A. No. His – his palm was on the top, and his fingers were –

Q. And the position that I just described that you had told me –

\* \* \*

Q. The position that I just described then, that's your testimony of at least how you and Uncle John are situated on the bed –

A. Yes.

Q. – and he takes his whole hand, left hand, under the covers, over your shirt, under your underwear and your shorts?

A. Yes.

{¶22} Thereafter, the victim indicated that she did not recall when the touching stopped but did remember Karla coming home, after which the victim, Karla, and Cipolla spoke in the bathroom. The victim recalled that she informed Karla that Cipolla touched her, and Cipolla denied doing so. The victim could not recall how she got home that night, but she again stated that she disclosed the abuse to her mother when she got home, but her mother did not believe her at that time.

14

Case No. 2022-A-0012

{¶23} Based on the foregoing, it appears that defense counsel was engaging in a strategy of attempting to flesh out details of the day of the incident to elicit inconsistencies in the victim's account which counsel could then use to challenge the credibility of the victim and other witnesses. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). This strategy may have been largely unsuccessful, but its lack of success does not render counsel's performance deficient. *See State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965, 977 (1995) ("reviewing courts must refrain from second-guessing the strategic decisions of trial counsel"). Further, counsel did obtain testimony from the victim that she and Cipolla were under the covers, which counsel used to argue, as discussed below, that Karla would not have been able to see Cipolla move his hand from the victim's leg when she entered the room. We cannot say that defense counsel's detailed cross-examination of the victim amounted to deficient performance.

{¶24} With respect to Cipolla's argument that defense counsel failed to effectively cross-examine the victim's mother, the victim's mother testified that on the date at issue, the victim had gone fishing with Cipolla. After the victim came home that evening, the victim disclosed to the mother that Cipolla had touched her. The mother called Karla regarding the accusation, and Karla seemed surprised and taken aback by the allegation. The victim's mother did not feel comfortable reporting the incident because she did not know specifically how the victim was touched. When the victim years later again referenced the incident, the victim's mother and father decided to report it to authorities.

15

The state then questioned the victim's mother about changes she had noticed in the

victim's behavior after the incident:

Q. So after this, now that you've decided to report, for you, did you see change again in [the victim's] behavior?

A. Yes.

Q. In what way?

A. She – instead of being more fearful and apprehensive, um, scared, she became angry. Um, she would fight. She would pick fights a lot with her siblings at that point. Um, she was having some problems in school. She really never recovered from that, honestly. The problems she was having, like, with her grades and things like that, when she was in elementary school, she was a straight A student for the most part. She didn't have any issues. And then after the event it just kind of spiraled downward for her, where she lost that interest to be involved with things at school. Um, she really didn't want to partake in sports or any events. She didn't want to be alone or with any man at that point whatsoever, even including her dad at some points, where she just didn't feel safe, where she would say she didn't feel safe.

* * *

Q. * * *. Her behavior you said changed for the worse after she disclosed but before you essentially believed her, right?

A. Yeah.

Q. Once you let her know that you believed her, did her behavior change again?

A. I don't know that her behavior ever really changed again. She definitely fought depression. Anxiety was outrageous. Um, she would punch holes in walls. Um, she would scream, you know, just about random things. She would have no patience or any kind of tolerance for anything. It's just her anxiety was so high all the time, and she used to not be that way. She was quiet and sweet and gentle. She was my gentle spirit child. She really was. Um, of all three of my kids, she was the softest and the sweetest and the kindest and the most genuinely, like, just open to, um people, I guess, and

16

then she just stopped that type of demeanor. She was very accepting and then just wasn't anymore.

Q. And how old was she when she stopped being that sweet child again?

A. I started really heavily seeing the changes when she was, like, 13, 14.

Q. When she told you initially, why was it difficult for you to believe her?

A. I didn't want to. I mean, to be honest, I – as a mom, that's the last thing you want to hear from your child, is that somebody that you trusted with your child would do something like that.

And shame on me. I take full responsibility, full responsibility for not listening to my daughter, and shame on me for not listening to her. As a nurse, I know better; but as a mom at the time, with a family member that I trusted with my children, I would have never thought something like this would have happened to me or my child. It's not something that you think will happen to your kid. It's no different than, you know, that it won't be me that gets diagnosed with breast cancer. My mom used to say that. You know, it's just that kind of a scenario, or it was for me, and I just did not want to believe that that had happened with my daughter.

But as we progressed many years down the line and I saw these huge changes in the demeanor of my daughter and how she went from that sweet little girl to this I wouldn't say monstrous-type of behavior but more of this aggressive, almost, like, hateful at times kind of person, it was evident that something had rocked her world. And, you know, you don't just do that. It doesn't just happen like that, to see her change like that.

It all made sense when we went to, like, talking through that night and looking back at all of the things that had happened with her in specific and how quickly things had changed and we'd seen the progression and, you know, and her grades dropping and her ability to be confident in who she was and her trust issues, her anxiety, her depression, all of those things became evident.

17

Case No. 2022-A-0012

Um, actually, if you don't care, I can share a little bit –

Q. Well, I've got to keep asking you questions.

A. No, you're fine. You're fine. That's fine.

Q. So, * * * in retrospect, do you regret not believing your daughter?

A. Absolutely.

{¶25} On cross-examination of the mother, defense counsel questioned her regarding her occupation as a nurse since 2006. The mother affirmed that she was familiar with the term "mandatory reporter," and the first time that the victim disclosed the incident to her, she did not feel that the allegations warranted reporting.

{¶26} Accordingly, defense counsel elicited testimony from the mother on cross-examination confirming she did not believe the victim's account of the incident warranted reporting. We cannot say that defense counsel was deficient for failing to continue to question the mother as to her initial disbelief that the victim was abused.

{¶27} Next, regarding Karla's testimony, she testified as a court witness. During the state's questioning, Karla affirmed that the day that Cipolla and the victim went fishing, they were at her house alone. When Karla came home, she walked into the bedroom and saw Cipolla quickly remove his hand from the victim's leg. Karla then spoke with the victim, who told Karla only that Cipolla's hand was on her leg. Thereafter, the state played a recording of Karla's interview with an officer, wherein Karla stated that the victim had told her that Cipolla had touched her, and it was their secret. Karla acknowledged that she stated in the interview that the victim informed her that Cipolla had touched her in her "privates," but at trial, Karla maintained that the victim never used that term. Karla

18

indicated that she did not report the incident because the victim did not want to talk about what had happened.

{¶28} During the defense's questioning of Karla, she maintained that she was at her house babysitting the victim's siblings in the living room on the day of the incident. When she came in the bedroom, she saw Cipolla's hand on the victim's leg. Karla initiated the conversation with the victim by asking if she was okay and asking if Cipolla had touched her. Karla indicated that she had never had a conversation with the victim's mother regarding the incident.

{¶29} As with defense counsel's cross-examination of the victim, counsel appears to have attempted to uncover discrepancies regarding the incident, and to some extent was successful in identifying that Karla recalled seeing Cipolla's hand on the victim's leg, although, as discussed above, the victim testified that Cipolla's hand was under the covers. We cannot say counsel was deficient in his cross-examination of Karla.

{¶30} As to the testimony of the sergeant who investigated the case, the sergeant testified that he reviewed medical records and interviewed Cipolla, who also provided a written statement. The detective indicated that there were inconsistencies in Cipolla's statements. For example, Cipolla first stated that he did not know the victim, and later stated that he did; Cipolla first indicated that he had not gone fishing with the victim, and later affirmed that he had; and Cipolla initially maintained that he had never been alone with the victim, and thereafter acknowledged that they had been alone together.

{¶31} On cross-examination, the sergeant indicated that the incident was reported approximately four years after it occurred. The sergeant did not personally interview the

19

victim or her mother, but instead reviewed the forensic interview and medical report, and thereafter interviewed Karla and Cipolla. The following exchange then occurred:

> Q. So, the information that you had was already the forensic interview.
>
> A. Right.
>
> Q. Medical reports. And you're not a doctor of any kind. You can't speak to the contents of a medical report; am I correct?
>
> A. I can just read the report and then look at the forensic interview, also.
>
> Q. Sergeant, what I'm asking you is, being a well-respected, well-educated officer for a police department does not qualify you to give testimony on the contents of medical records or forensic interviews; am I correct?
>
> A. No. I would say no. But, again, I would say yes to the fact – not the actual medical part of it, but I can testify, I would think to the fact that I can hear someone and understand what they're saying.

{¶32} After the sergeant's testimony, the state rested. Defense counsel objected to the admission of the medical report referenced in the sergeant's testimony, and the court excluded the report.

{¶33} Regarding defense counsel's cross-examination of the sergeant, he referred to the sergeant "well-respected, well-educated officer for the police department" in the context of contrasting the sergeant's qualifications with those of someone in the medical field. We cannot say defense counsel's prefacing of this question in this manner amounted to deficient performance.

{¶34} After the state rested its case, the court addressed Cipolla:

> THE COURT: Okay. Mr. Cipolla, the State's rested its case against you. Now is the time you have to decide whether or not you are going to testify or not testify. If you choose to

20

testify, [the state] will have an opportunity to cross-examine you. If you choose not to testify, that is your constitutional right, and I will instruct the Jury that they cannot hold that against you because it is your constitutional right.

Do you understand that?

[CIPOLLA]: Yes, I do.

THE COURT: Okay. And after consulting with counsel, what are you going to do?

[CIPOLLA]: I really don't think I talked to him too much about it. I don't think I'm really good to get up there. I can't really talk very good, and I just think I'd rather just not go up there.

THE COURT: That's your decision you understand?

[CIPOLLA]: I'm not a very good talker. Yes, I know. I don't know if I could even do that. My anxiety and stuff is ridiculous.

THE COURT: Okay. So, I just want to make sure that –

[CIPOLLA]: I mean, is there –

THE COURT: We're not forcing you.

[CIPOLLA]: I mean, I just don't want to go up there and do it, incriminate myself.

{¶35} To the extent that Cipolla relies on this portion of the transcript as support that defense counsel failed to properly advise Cipolla regarding his right to testify or not testify, the transcript does not demonstrate the nature or extent of defense counsel's discussions with Cipolla on this issue. Accordingly, Cipolla would be required to resort to sources outside the record in support of his claim. A claim of ineffective assistance of counsel challenging counsel's performance based upon sources outside the record is not properly reviewed on direct appeal; instead, such a claim may be brought through a petition for postconviction relief. *State v. Weathersbee*, 11th Dist. Trumbull No. 2018-T-

21

0099, 2019-Ohio-5307, ¶ 29. Accordingly, insofar as Cipolla has challenged defense counsel's failure to properly advise him as to his right to testify, we are unable to reach the merits of such a claim at this time.

{¶36} After the discussion regarding Cipolla's decision to not testify, defense counsel indicated to the court that the defense would not be calling any witnesses. During closing arguments, defense counsel pointed to a discrepancy in the testimony as to whether Karla was home babysitting the victim's siblings when Cipolla and the victim returned from fishing. Defense counsel questioned how Karla could witness Cipolla's hand move from the victim's leg if the victim were under the covers. Defense counsel further pointed to the victim's testimony that she could not recall details after the incident, such as how she got home. Counsel noted that the victim's mother, a nurse and mandatory reporter, did not believe or report the allegations in 2014. Defense counsel further indicated that Karla's questioning of the victim led her to answer that Cipolla touched her. Defense counsel maintained, "And to find Mr. Cipolla guilty, there's not enough evidence to support it. There's enough reasonable doubt here. There's enough unanswered questions in this particular matter to charge him with this heinous of a crime, and we're not fully convinced of the truth of the matter asserted."

{¶37} Cipolla maintains that defense counsel was deficient in his closing argument by failing to identify the "unanswered questions" that remained and failing to address any expectation created by counsel's opening statement that Cipolla would testify. As discussed above, defense counsel indicated during his opening statement that Cipolla may not testify. Defense counsel's reference in closing argument to the "unanswered questions" appears to be a summation of the points that defense counsel had raised

22

earlier in his closing argument, such as how Karla was able to view Cipolla's hand move from the victim's leg if she were under the covers and why the alleged abuse was not reported in 2014. We cannot say defense counsel was deficient in closing argument.

{¶38} After closing arguments, the trial court's instructions to the jury included a standard instruction regarding Cipolla's decision to not testify: "It is not necessary that the Defendant take the witness stand in his own defense. He has a constitutional right not to testify. The fact that the Defendant did not testify must not be considered for any purpose." The transcript indicates that the jury began deliberating at 4:40 p.m. and the jury advised the bailiff at 5:15 p.m. that a verdict had been reached.

{¶39} While we have specifically addressed and rejected many of Cipolla's arguments regarding deficient performance above, we further conclude that Cipolla has failed to establish prejudice relative to his ineffective assistance arguments. In his brief, Cipolla focuses on deficient performance pursuant to the first *Strickland* prong. However, he presents only a limited argument with respect to the second *Strickland* prong, as he notes that prejudice "is always subject to some level of conjecture," and then presents what he believes would have been a more effective defense theme of focusing on the mother's initial disbelief of the victim. However, for the reasons that follow, we cannot conclude from the transcript that, if not for counsel's purported errors, there exists a reasonable probability the result of the trial would have been different. *See State v. Moore*, 11th Dist. Geauga No. 2011-G-3027, 2012-Ohio-3885, ¶ 69, citing *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), citing *Strickland*, 466 U.S. at 695-696 ("If a claim can be disposed of by showing a lack of sufficient prejudice, there is

23

no need to consider the first prong, i.e., whether trial counsel's performance was deficient.").

{¶40} Cipolla was charged with gross sexual imposition in violation of R.C. 2907.05(A)(4), which provides, "No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies: * * * The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person." "'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01. The victim testified to the elements of the offense. Karla also testified consistently with the victim with respect to Cipolla and the victim being present together in the bed and Cipolla quickly removing his hand from the victim's leg when Karla entered the room. The jury was made aware through the testimony that the mother did not initially believe that the incident warranted reporting. Even if this court were to find that defense counsel performed deficiently in the ways Cipolla identifies, we cannot say that such errors undermined confidence in the outcome of the trial.

{¶41} Accordingly, Cipolla's first assigned error lacks merit.

{¶42} In his second assigned error, Cipolla argues:

{¶43} "The imposition of maximum sentence is contrary to law."

{¶44} Cipolla maintains that the trial court incorrectly interpreted Cipolla's statement that he did not want to incriminate himself, quoted above in our discussion of

24

Case No. 2022-A-0012

Cipolla's first assigned error, as an admission of guilt, and improperly used its false interpretation in determining Cipolla's sentence. In support, Cipolla points to the following exchange that occurred at sentencing:

> THE COURT: * * * [S]omething happened during the course of the trial that in my 40 years of practice – and this is my 34th year as a judge – will stick out in my mind.
>
> I have a long history at jury trials of asking the Defendant, and I explain to them, as I did you, that you had a constitutional right to testify; you had a constitutional right not to testify. If you exercise you constitutional right not to testify, the jury will be told that you are exercising your constitutional right and that they cannot hold that against you. And I told you that, just as I have I'm going to estimate 300 other defendants over the last 33 plus years. Correct? I did say that to you. Do you remember that?
>
> [CIPOLLA]: I think, yeah.
>
> THE COURT: Do you remember your response? Because it's one that will stick with me forever.
>
> Your response was you didn't want to testify because you would just incriminate yourself. That I found stunning and shocking. It wasn't said in front of the jury because I don't have that conversation with defendants in front of the jury. But in all my years, that's the only time I can recall the defendant ever saying that to me in court.
>
> Is there anything else you wanted to say, Mr. Cipolla?
>
> [CIPOLLA]: No.

{¶45} Cipolla maintains that he used the word "incriminate" in the context of not wanting to inadvertently make a statement *implying* guilt, and not as an admission of guilt. Further, he maintains that the court failed to give weight to the facts that he was a first offender, that he had a good job, and that he was rated at a low risk to re-offend.

Case No. 2022-A-0012

{¶46} As to the alleged misinterpretation of the term "incriminate," Cipolla maintains that "the true definition of 'incriminate,'" is "'to make someone appear guilty of a crime or wrongdoing, strongly imply the guilt of someone.'" *See* The Oxford Pocket Dictionary of Current English, Encyclopedia.com, https://www.encyclopedia.com/social-sciences-and-law/law/law/incriminate (last accessed Oct. 6, 2022) (providing the definition quoted by Cipolla); *compare* Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/incriminate (last accessed Oct. 6, 2022) (defining "incriminate" as "to charge with or show evidence or proof of involvement in a crime or fault"). When using the term "incriminate," Cipolla maintains that he was not admitting to the offense. However, at no time during sentencing did Cipolla attempt to correct his perceived misinterpretation of his statements, and thus Cipolla's intended meaning when using the term "incriminate" is not apparent from the record.

{¶47} Next, as to Cipolla's argument that the length of his sentence was not warranted, "R.C. 2929.12(A) grants the sentencing judge discretion "'to determine the most effective way to comply with the purposes and principles of sentencing.'"" *State v. Watson*, 11th Dist. Ashtabula No. 2020-A-0038, 2021-Ohio-2549, ¶ 25, quoting *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, ¶ 37, quoting R.C. 2929.12(A). "In exercising that discretion, the court shall consider, along with any other "'relevant'" factors, the seriousness factors set forth in divisions (B) and (C) and the recidivism factors in divisions (D) and (E) of R.C. 2929.12." *Watson* at ¶ 25, quoting *Foster* at ¶ 37, quoting R.C. 2929.12(A).

{¶48} With respect to our review of a felony sentence, this court is not permitted to "independently weigh the evidence in the record and substitute its judgment for that of

26

Case No. 2022-A-0012

the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, ¶ 42.

{¶49} Accordingly, Cipolla's second assigned error lacks merit.

{¶50} The judgment is affirmed.


JOHN J. EKLUND, P.J.,

MARY JANE TRAPP, J.,

concur.

Case No. 2022-A-0012